Argued and submitted April 19, affirmed July 5, petition for review denied October 4, 2012 (352 Or 564)

In the Matter of T. M. R.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. R.
and M. M.,
*Appellants.*

Marion County Circuit Court
J100392;
Petition Numbers 061410RAM1,
101910RAM1;
A149823

282 P3d 969

Erin Galli argued the cause for appellant M. M. With her on the brief was Chilton & Galli, LLC.

Megan L. Jacquot argued the cause and filed the brief for appellant T. R.

Todd C. McCann argued the cause for child T. M. R.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John

R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

In this juvenile dependency case, father and mother separately appeal from a judgment of the juvenile court changing the permanency plan for the child from reunification to adoption. ORS 419B.476. The juvenile court determined that the Department of Human Services (DHS) provided reasonable services to both parents but that the parents had not made sufficient progress to allow the child to safely return home. We affirm.

The facts are largely undisputed.[1] The child was born in February 2010. In June 2010, when she was approximately three months old, her parents brought her to the emergency room because they had noticed that the child's right forearm was swollen. An x-ray revealed fractures in the radial and ulnar bones of the right arm. Because they were concerned about nonaccidental trauma, doctors conducted a bone survey, which revealed 27 fractures at various stages of healing on the child's ribs, arms, legs, and both feet. The doctors concluded that the fractures must have occurred while the child was in the parents' custody. Doctors also noticed numerous bruises, unusual in a child so young. The child was taken into protective custody at the hospital and has remained in the custody of DHS since June 2010. In September 2010, the parents stipulated to jurisdiction.

The parents, who are hearing impaired, acknowledged that they might have been rough with the child, but denied having intentionally caused any injuries. They offered various possible explanations for the injuries, including mother accidentally rolling over the child in bed (the child slept in the same bed as her parents), mistreatment by roommates or other caregivers, and brittle bone disease caused by a lack of vitamins or sun during mother's pregnancy. There was medical evidence that a child experiencing such injuries would have been in considerable pain and distress. Father acknowledged that he may not have been as attentive as necessary to the child because of marijuana use; however, both parents denied being aware that the child was in distress.

---

[1] If there is any factual dispute, we state the facts consistently with the court's findings of fact. *See* 251 Or App at 10 (discussing standard of review).

Physicians conducted a skeletal survey and lab tests to assess the child's bone health, and ruled out the possibility that the broken bones were the result of a medical condition. They also determined that the injuries could not have come about from normal caregiving. Although it was possible that something rolling over the child could have caused the injuries, the medical opinion was that the injuries were not the result of the child having been rolled over by a parent in bed. Rather, the doctors concluded that the injuries were the result of nonaccidental trauma, *i.e.*, abuse. Since June 2010, when the child was placed in foster care, she has not developed any additional fractures. At the time of the permanency hearing, the child was 18 months old.

DHS provided both parents with alcohol and drug abuse services, parent training, individualized counseling, and supervised visits with the child. The parents participated fully with those services. The parents participated in psychological evaluations that ruled out chronic disorders that would contribute to or explain physical abuse of the child.

The most critical question in this case was: How was the child injured? The preponderance of the evidence was that the multiple injuries occurred while the child was in the care of one or both parents. DHS did not require the parents to expressly admit culpability for the child's injuries before engaging in case planning or offering services; however, in the parents' signed agreements, they each agreed to explain to DHS how the child was injured. Nonetheless, they failed to provide an explanation. Based on expert medical evidence, the agency determined early on that, in the absence of an explanation by the parents as to how the injuries had occurred so that the agency could get to the root cause of the injuries, it would not be possible to know if the services DHS provided to the parents were going to remediate the reason why the child came into care. The state's position was that, although the parents had complied *generally* with DHS's services, they had not *specifically* and meaningfully participated in those services, because each parent had failed to provide information to DHS that would have allowed it to provide services directed to the cause or causes of the

child's injuries. In contrast, the parents contend that they fully participated in the services DHS offered. They assert that, if DHS had determined that it was necessary to offer the parents services to prevent further physical abuse to the child, then it was DHS's obligation to provide those services. In the absence of such services, the parents contend, DHS had not made reasonable efforts to safely return the child to the parents' home. After considering our standard of review, we will consider the statutory requirements to change a permanency plan from reunification to adoption.

We have the discretion to review this type of case *de novo*. ORS 19.415(3)(b). However, the parties have not requested *de novo* review, and we decline to conduct such a review. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Therefore, our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence, and whether, as a matter of law, those facts provide a basis for the court's determination. *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 351, 265 P3d 792 (2011).

ORS 419B.476 sets forth the requirements for a change in the permanency plan from reunification to adoption and provides, in relevant part:

"(1) A permanency hearing shall be conducted in the manner provided in ORS 418.312, 419B.310, 419B.812 to 419B.839 and 419B.908, except that the court may receive testimony and reports as provided in ORS 419B.325.

"(2) At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts *** to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns.

"*****

"(5) The court shall enter an order within 20 days after the permanency hearing. In addition to any determinations or orders the court may make under subsection (4) of this section, the order shall include:

"(a) The court's determination required under subsections (2) and (3) of this section, including a brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing;

"* * * * *

"(d) If the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the circumstances in ORS 419B.498(2) is applicable[.]"

In *State ex rel DHS v. S. L.*, 211 Or App 362, 371-72, 155 P3d 73 (2007), this court explained what is required under the statute in order to change the plan of reunifying the family to a concurrent plan:

"[T]o warrant a change in the permanency plan from reunification to adoption under the circumstances described in ORS 419B.476(2)(a), the court must find that, despite DHS's reasonable efforts to make it possible for the child to return home safely, a parent has not made sufficient progress to enable this to occur."

The juvenile court in this case determined that DHS had provided appropriate services and that the parents "did an excellent job in those services and that progress shows that the parents may have matured and may be able to have improved skills in the future." In determining nonetheless that the permanency plan in this case should be changed from reunification to adoption, the juvenile court said that the parents' success in classes and services does not "convince the court that parents are rehabilitated or that the services are likely to prevent future abuse of the child." The court found that, in light of medical testimony concerning the nature of the injuries and the pain inflicted on the child, the parents' denial of awareness of the child's injuries and distress was not credible.[2] Again relying on medical opinion, the court expressed the additional concern that, if the parents did not know what had caused the child's injuries, it would be hard to prevent the injuries from recurring. The court said that, "[w]ithout any acknowledgement of any kind of responsibility, this child cannot be safely returned home. At

---

[2] Based on that specific finding, the court found that the parents' credibility was completely undermined.

a very minimum, the parents knew, or should have known, that this child sustained injuries." Quoting the requirement from ORS 419B.476(2)(a) that "the court shall consider the ward's health and safety the paramount concerns," the court concluded that the parents had not made sufficient progress toward reunification.

The parents' primary assertion in this case is that, in the context of both the "reasonable efforts" and the "sufficient progress" determinations, the juvenile court gave undue weight to the fact that the parents have not provided specific information about or directly acknowledged responsibility for the child's injuries. In separate appeals, father and mother each contend that the trial court erred in determining that DHS had made reasonable efforts to reunify the family, due to DHS's position that no services could lead to reunification unless there was an explanation for the child's injuries. In father's view, there is no expert testimony that it was necessary for the parents to admit responsibility for the injuries in order to be adequately treated, and the record shows that the parents were making great progress in the services that were provided and were thereby reducing risk by learning new skills. In both parents' view, if DHS believed that the parents had caused the child's injuries, then it was incumbent on DHS to offer services to the parents to address issues of abuse; DHS did not do so, due to its mistaken belief that, in order for those services to be effective, the parents needed to acknowledge responsibility for the child's injuries. Mother contends, further, and for the first time on appeal, that DHS's decision to condition the reunification of the family on an explanation of the cause of the child's injury was not permissible under the Fifth Amendment to the United States Constitution,[3] and that the juvenile court erred by failing to establish deadlines for DHS to file a petition to terminate parental rights and to place the child for adoption, as required by ORS 419B.476(5)(b)(B).

We begin by addressing the parents' contention that the juvenile court erred in determining that DHS made reasonable efforts to make it possible for reunification. When

---

[3] The Fifth Amendment provides, in part, "No person shall * * * be compelled in any criminal case to be a witness against himself[.]"

a case plan for the child at the time of hearing is to reunify the family, the juvenile court must, among other requirements, determine whether DHS "has made reasonable efforts * * * to make it possible for the ward to safely return home[.]" In making that determination, the child's health and safety are "the paramount concerns." ORS 419B.476(2)(a). DHS's efforts are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction. *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012). The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it has required parents to take are reasonable. *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998).

One of the bases for jurisdiction over the child, admitted by both parents, included the many unexplained injuries suffered by the child while in the parents' custody. Father also admitted to jurisdiction based on a chemical abuse problem including marijuana. The services provided by DHS included drug and alcohol assessments and counseling; domestic violence evaluations; psychological evaluations; classes recommended after those evaluations; individual counseling; referrals for vocational rehabilitation, housing, and insurance; provision of bus passes, gas vouchers, and transportation; and American Sign Language translators as needed. The juvenile court determined that DHS's efforts were reasonable.

The parents contend that, if, as the juvenile court found, the parents are responsible for the child's injuries, then despite their failure to acknowledge responsibility, there were specific additional services, such as abuse prevention therapies, that DHS should have provided to the parents in order to enable the parents to make sufficient progress to make it possible for the child to safely return home. DHS responds that, even assuming that the parents assumed general responsibility for the injuries, which they did not, the evidence shows that, in the absence of more specific information as to how the injuries likely occurred, it was not possible for DHS to formulate a plan that could address the specific causes of the abuse. Hartman, a psychologist who evaluated the parents, opined that, before reunification

occurred, it would be critical to know the causes of the child's injuries, because "it is difficult to prevent problems from reoccurring if it is unknown * * * what caused the problems the first time around." Another psychologist, Gordon, who separately evaluated father, noted that "[t]here are ongoing concerns about his ability to safely parent his children until it is determined how his daughter got the injuries[.]" We agree with DHS that the evidence in the record supports its contention that, before services could be directed at the specific causes of the abuse, it would be necessary for the parents to provide more information as to the causes of the abuse, *i.e.*, how the child came to be injured.

Mother contends, nonetheless, that, by requiring the parents to provide an explanation for the injuries, DHS is, essentially, requiring the parents to admit guilt before it will offer services directed more specifically to abuse, and thereby violating the parents' privilege to be free of self-incrimination under the Fifth Amendment. We need not address that argument, as mother failed to make it to the juvenile court.[4] *See* ORAP 5.45(1) (the court will not consider a claim of error unless it was preserved in the juvenile court). We conclude that the record supports the juvenile court's conclusion that DHS's efforts were reasonable.

---

[4] In *Dept. of Human Services v. K. L. R.*, 235 Or App 1, 10, 230 P3d 49 (2010), we held that the imposition of a requirement that a parent admit abuse or submit to a polygraph exam as a condition of reunification ran afoul of the parent's Fifth Amendment right to avoid self incrimination;

"To summarize: (1) requiring an admission of abuse as a condition of family reunification violates a parent's Fifth Amendment rights; (2) on the other hand, terminating or limiting parental rights based on a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy, may not violate the Fifth Amendment; and (3) providing use immunity from criminal prosecution is a necessary condition to compelling potentially incriminating statements as an inducement for full cooperation and disclosure during dependency proceedings."

At the conclusion of the hearing in this case, the child's attorney cited *K. L. R.* for the proposition that it is unsafe for a child to be with parents who are abusive and violent. The juvenile court also cited the case, as authority for its conclusion that meaningful rehabilitation cannot occur without an acknowledgment of wrongdoing, as distinct from an admission of abuse.

In addition, mother ignores the express language in the judgment of jurisdiction, which provides, "The admissions by mother and father on [September 28, 2010,] as they relate to resolving the petition shall not be used in any subsequent criminal matter."

We turn to the issue of "sufficient progress." The parents contend that their full and successful participation in all of the offered services, including substance abuse treatment, psychological evaluations, supervised visits, parenting classes, joint and individual counseling, and mentoring services, have reduced the risk that the child will be injured in their care, assuming that one of the parents was the abuser. There was evidence that the parents have a strong bond with the child, that they are a good and cooperative parenting team, and that they have done a large amount of work to reduce the risk of injury. In the parents' view, that is all that is required in order to demonstrate sufficient progress. *See State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 717, 145 P3d 354 (2006) (standard for sufficient progress is not whether parents are model parents, but whether parents' failure puts child's health and safety at risk).

As noted, the juvenile court found that the parents either caused, or knew or should have known of, the child's injuries, and that finding is not challenged by the parents. A primary concern of DHS and the trial court is that, despite the parents' cooperation and participation in the provided services, the parents' categorical denial of any knowledge concerning the source of the child's injuries has been the major obstacle to DHS's efforts. In the absence of such information, DHS has taken the position that it is not possible to know whether the provided services have addressed the underlying cause of the child's injuries; thus, it could not be determined whether the child would still be at risk if returned home or if the parents had made sufficient progress to allow reunification. There is evidence in support of that concern, which was essentially adopted by the juvenile court. The court found that, despite the parents' participation in services, in the absence of an acknowledgment of wrongdoing by the parents, the court was not convinced that the parents were rehabilitated or that those services were likely to prevent future abuse of the child. Thus, the court implicitly concluded that the parents had not made sufficient progress to make it possible for the child to return home. The evidence supports that determination by the trial court.

Finally, mother contends that the juvenile court committed reversible error in failing to establish a deadline for DHS to file a petition to terminate parental rights and to place the child for adoption, as required by ORS 419B.476(5)(b)(B).[5] We have held in a number of opinions that a failure to make determinations under ORS 419B.476 is reversible error. *See, e.g., State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 181-82, 205 P3d 36 (2009) (juvenile court's failure to make the determinations required by ORS 419B.476(5)(f) is reversible error); *State ex rel Juv. Dept. v. J. F. B.*, 230 Or App 106, 115, 214 P3d 827 (2009); *see also State ex rel Dept. of Human Services v. S. A.*, 250 Or App 720, 281 P3d 655 (2012) (holding that, in a judgment continuing a guardianship after a permanency hearing, the juvenile court's failure to include any permanency determinations required by ORS 419B.476(5) was reversible error under *M. A.*); *Dept. of Human Services v. W. F.*, 240 Or App 443, 247 P3d 329 (2011) (failure to make findings required by ORS 419B.476(2)(b) and (c) reversible error). We have said, further, that the failure of the judgment to make the determination required by ORS 419B.476(5)(d) whether any of the circumstances in ORS 419B.498(2) are applicable is "fatal," causing such judgments to be "defective on their face." We explained in *M. A.* that the requirement for such findings reflects the legislature's intent "that the court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child." *M. A.*, 227 Or App at 183.

We have never addressed whether the juvenile court's failure to make the findings required by ORS 476B.476(5)(b)(B) is similarly fatal, and we conclude here, based on the different nature of the findings and language in this particular judgment, that it is not. Unlike the

---

[5] ORS 419B.476(5) provides, in part:

"The court shall enter an order within 20 days after the permanency hearing. * * * [T]he order shall include:

"* * * * *

"(b) The court's determination of the permanency plan for the ward that includes whether and, if applicable, when:

"* * * * *

"(B) The ward will be placed for adoption, and a petition for termination of parental rights will be filed[.]"

findings required by ORS 419B.476(2)(b) and (c) and ORS 419B.476(5)(a), (d), and (f), which go to the heart of the decision to change the permanency plan to adoption, the juvenile court's findings under ORS 476B.476(5)(b)(B) as to when the ward will be placed for adoption and when a petition for termination rights will be filed does not reflect on the substance of the juvenile court's permanency determination. Unlike the determination required by ORS 419B.476(5)(d) whether any of the circumstances in ORS 419B.498(2) are applicable, the setting of a date for the filing of a petition for termination and placing the child for adoption does not go to the heart of the permanency determination as a reflection of the bases for the court's reasoning or ultimate decision. 227 Or App at 183.

Further, while the juvenile court did not state the date by which the petition for termination of parental rights shall be filed, the juvenile court did include in the judgment that it would conduct a "preliminary hearing on the TPR petition" on November 7, 2011, which was less than 60 days from the date of the judgment. By scheduling a preliminary hearing, the juvenile court notified the parties that the petition for termination would have to be filed before that date. That information contained in the judgment certainly informs the parties of information similar to that required by ORS 419.476(5)(b)(B).

We conclude, for those reasons, that the juvenile court's failure to make the findings required by ORS 476B.476(5)(b)(B) is not a defect that is fatal to the judgment and reversible error *per se*. And, to the extent that there was error, we conclude that it was harmless.

Affirmed.