Argued and submitted September 25, 2012, affirmed March 6, 2013

In the Matter of C. D.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent*,

*v.*

A. D.
and K. F.,
*Appellants*.

Douglas County Circuit Court
1000410;
Petition Number 10JU294;
A151194

300 P3d 185

Christa Obold-Eshleman argued the cause and filed the brief for appellant A. D.

Holly Telerant, Deputy Public Defender, argued the cause for appellant K. F. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F.

Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

In this juvenile dependency case, mother and father separately appeal from a judgment of the juvenile court changing the permanency plan for their child, C, from reunification to adoption. ORS 419B.476. The juvenile court determined that the Department of Human Services (DHS) had made reasonable efforts to reunify C with parents and that parents had not made sufficient progress to make it possible for C to safely return home and would not do so within a reasonable time. We conclude that there is adequate support in the record for the findings made by the juvenile court and that those findings provide a basis for its legal determinations. Accordingly, we affirm.

We decline to conduct *de novo* review; indeed, the parties have not requested that we do so and this is not an exceptional case that warrants such review. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review of certain equitable actions); ORAP 5.40(8)(c) (the court will exercise discretion to try the cause anew on the record only in "exceptional cases"). Accordingly, our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence and whether, as a matter of law, those facts provided a basis for the court's determinations. *Dept. of Human Services v. T. R.*, 251 Or App 6, 10, 282 P3d 969, *rev den*, 352 Or 564 (2012). We begin by addressing how DHS became involved in the case and then address the services that were provided to parents and their response to those services.

DHS took C into protective custody in September 2010 when she was three months old, after parents brought her to an emergency room for colic, and a doctor discovered that she had sustained two posterior rib factures. Parents denied any knowledge of how the fractures occurred, although mother suggested that perhaps she had put C into a swing "too hard." Following a contested jurisdictional hearing in January 2011, the court asserted jurisdiction on the following bases:

"a) [C], age three months, has two posterior rib fractures in various stages of healing that are the result of non-accidental trauma. Parents are not able or willing to provide an explanation for these injuries.

"b)   Parents exhibit cognitive deficiencies that inhibit their ability to understand the seriousness of the trauma their child has experienced."

The following month, at the request of DHS, Dr. Ewell, a clinical psychologist, evaluated both parents. He diagnosed mother with an adjustment disorder and mixed anxiety and depressed mood, along with cognitive limitations and dependent personality features secondary to cognitive deficits. Ewell noted that mother "demonstrates specific deficits in areas pertaining to social judgment, interpersonal problem-solving and abstract reasoning." Mother reported experiencing significant depression and anxiety that had become "nearly disabling." Ewell noted that mother was "highly dependent upon relationships with other people" and particularly dependent upon both father and her own father, who manages her finances and serves as her payee for Social Security benefits that she receives for a learning disorder. Overall, given mother's limited cognitive abilities, Ewell opined that

"[mother] could benefit from parenting course work, but will require individualized instruction. It will be necessary for her to be coached and supported as she attempts to acquire skills and apply them to her own life. In-home parenting coaches would be very beneficial to her. She will also require help in organizing her daily schedule, completing basic chores and managing daily life."

Ewell diagnosed father with cognitive limitations and post-traumatic stress disorder (PTSD) in partial remission. Ewell observed that father

"most likely has difficulty understanding complicated scenarios, or abstract reasoning processes. There is also evidence that he experiences difficulty understanding concepts presented in parenting classes. It is likely he will also have difficulty applying what he has learned to his real life."

Ewell opined that, as in mother's case, father would benefit from individualized forms of instruction. He further concluded that father

"will best learn from course work that is skill-based and behaviorally oriented. He will need to observe role models

of appropriate parenting and then practice those skills while receiving feedback. Even then, he may have difficulty applying what he learns to his own life. [Father] could probably also benefit from some individual counseling to address his PTSD. * * * [Father's] ability to problem-solve and to follow through with a plan to keep his child safe is limited. At present, I would have concerns regarding his capacity to be a safe resource for his daughter. His future treatment/education providers will be in the best position to signal if he ever acquires the basic skills to demonstrate such an ability."

Ewell noted that mother and father "might also benefit from couples counseling to address their communication patterns, joint problem-solving and co-parenting strategies." However, he concluded that,

"[e]ven with course work, I believe the prognosis for [mother and father] becoming minimally adequate parents is guarded. I would not consider this to be a case where [DHS] can intervene, provide services and then successfully close the case. Instead, I believe [mother and father] will most likely require intervention throughout the foreseeable future."

About a week after the psychological evaluations, DHS began facilitating extended visits between C and mother and father. Home care nurse Fulmerton, who had been following C since shortly after C's birth, participated in those visits in order to "help[ ] the parents to engage more actively" with C. Fulmerton made a home visit to assess the home environment in April and worked with both parents on their parenting skills until mid-June. Both parents were also provided with intensive parenting classes and a parenting coach for DHS office visits, and mother was provided with mental health services to address stress management techniques and strategies.[1] The record does not indicate that mother and father received the other services that Ewell had recommended—that is, couples counseling and individualized treatment for father's PTSD.

---

[1] Although mother made progress in mental health treatment, her caseworker reported that she made the impulsive decision to stop attending in August, in part, because of a conflict in her schedule that she did not attempt to communicate about or solve in any way. According to the caseworker, "[t]his * * * resulted in a setback directly impacting the ability to implement a sustainable in-home safety plan for [C]."

In addition to the instructional assistance provided by Fulmerton, in-home parenting mentor Wafer facilitated home visits from August to October and planned for "a five to six hour time frame at various times during the day to assess parenting skills."[2] Beginning in November and continuing until the March 2012 permanency hearing, DHS caseworker Price facilitated visits at the DHS office once per week for two hours at a time.

At the permanency hearing in March 2012, DHS argued that it had made reasonable efforts to attempt to resolve the bases for the court's exercise of jurisdiction and that, despite the services provided, mother and father had failed to make sufficient progress. Both parents countered that DHS's efforts were not reasonable and that they had nevertheless made sufficient progress. Mother characterized Wafer's services as too short in duration and as not being "a real intensive type thing where they did in-home type of planning" as suggested by Ewell.

The juvenile court determined that the efforts made by DHS were reasonable and that mother and father had not made sufficient progress for C to safely return home. The court noted that both parents' "cognitive deficiencies *** create all kinds of issues for [them] and their care of [C]." The court explained that it had "real concern *** about [parents'] ability to repair, or to deal with these cognitive issues" and that "it appears that [DHS] has given a great deal of time and consideration and programming to this case." Despite the services that were provided, the court noted a number of instances in which parents demonstrated that they did not have the cognitive ability to protect C. The court recounted, by way of example, an incident in which

---

[2] Wafer prepared extensive notes documenting her observations from visits occurring during that August-to-October timeframe, and those notes apparently were the basis for the juvenile court's finding that Wafer began providing services in August. However, the record indicates that Wafer actually began working with parents in May.

Although we have discretion to review this case *de novo* in order to recognize that inconsistent evidence, a finding that Wafer provided an additional three months of services is not necessary to a conclusion that DHS's efforts were reasonable. As we will explain, the services provided by DHS in addition to Wafer's extensive instructional guidance provide sufficient support for the juvenile court's determination that the efforts made by DHS were reasonable.

mother had become so distracted by dealing with kitty litter and caring for the cats that she failed to notice C beginning to eat dog food, and another instance in which parents had great difficulty extracting a crayon that C had put in her mouth.

The court determined that there was "no evidence of any progress regarding * * * the cognitive deficiency, nor any indication that there is likely to be any change in that in the future." It concluded:

> "Cognitive issues are * * * difficult * * * to deal with when it's unclear that * * * those can be remedied in any short term fashion. In this case I am finding that reasonable efforts have been made, finding that there hasn't been progress, nor in the foreseeable future that there would be progress made such that this child could be returned home."

The court acknowledged that "these parents love this child, and that this child is delighted at their presence" but, in accordance with its determinations, changed the permanency plan from reunification to adoption.

On appeal, parents challenge the juvenile court's determinations that DHS made reasonable efforts to reunify the family and that parents did not make sufficient progress to allow for C to safely return home.[3] They also argue that the court erred in determining that further services would not make possible C's safe return within a reasonable time. DHS responds that the record supports the court's determination as to reasonable efforts and the lack of sufficient progress, and argues that it was not required to prove that parents' progress demonstrated that further services would not enable C's safe return within a reasonable time. We conclude that the facts found by the juvenile court are supported by the record and provided an adequate legal basis for each of its determinations, including the determination that further services would not enable C's safe return within a reasonable time.

---

[3] Father also contends that there is insufficient evidence that the grounds for jurisdiction continued to exist. As the state points out, father did not ask the juvenile court to dismiss dependency jurisdiction and terminate wardship. Because father did not preserve a challenge to jurisdiction, we do not address that contention further.

ORS 419B.476(2)(a) provides:

"If the case plan at the time of the hearing is to reunify the family, [the juvenile court must] determine whether [DHS] has made reasonable efforts \* \* \* to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Accordingly, in order to change the permanency plan, the juvenile court must determine that (1) DHS has made reasonable efforts to make it possible for the child to safely return home and (2) despite those efforts, parents have not made sufficient progress to allow the child to safely return home. "The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it has required parents to take are reasonable." *T. R.*, 251 Or App at 13. We address each of those required determinations in turn, beginning with the determination that DHS made reasonable efforts to make it possible for C to safely return home.

Parents' challenges to the adequacy of DHS's efforts reduce to two basic arguments: that the services DHS provided were not sufficiently related to the bases for the juvenile court's jurisdiction, and that the services provided did not sufficiently follow Ewell's recommendations. We address each contention in turn.

To reiterate, the juvenile court asserted jurisdiction on the following bases:

"a)   [C], age three months, has two posterior rib fractures in various stages of healing that are the result of non-accidental trauma. Parents are not able or willing to provide an explanation for these injuries.

"b)   Parents exhibit cognitive deficiencies that inhibit their ability to understand the seriousness of the trauma their child has experienced."

The primary concern throughout this case has been that parents, because of their cognitive deficiencies, are unable

to recognize or acknowledge threats to C's safety. In view of that concern, DHS provided parents with a number of services, including psychological evaluations, mental health services for mother, parenting classes, intensive monitoring, and extended supervised visits. We agree with the state that those services were sufficiently related to the bases for the court's exercise of jurisdiction.

As we explained in *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 300, 266 P3d 107 (2011),

> "where the jurisdictional judgment is based on an unexplained, nonaccidental injury[,] the basis for jurisdiction includes those 'conditions or characteristics' *potentially demonstrated by the specific facts alleged.* In other words, it properly encompasses those conditions or characteristics that could have caused the nonaccidental injury. *See [Dept. of Human Services v. G. E.*, 243 Or App 471, 479, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011)]."

(Emphasis added.) That universe may, for example, "point to physical abuse, substance abuse, mental health issues, domestic violence, failure to protect, or other conditions. The universe, however, will narrow as DHS identifies possible explanations for the injury and develops a case plan based on that knowledge." *Id.* (citing *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 516, 209 P3d 810 (2009) (a parent's progress is assessed with reference to the "barrier to reunification * * * identified in the dependency petition and the applicable case plan")). Here, mother and father were "not able or willing" to explain C's nonaccidental injuries. As DHS asserts, the "barrier to reunification" necessarily included the cognitive issues that potentially contributed to C's injuries and inhibited parents' ability to understand the seriousness of the trauma to C. Thus, DHS's concern is whether mother and father have the ability to understand what may have contributed to C's injuries and the steps they must take in order to create a safe environment for C. The services provided were directed toward addressing barriers to that understanding by teaching mother and father the steps required to safely care for C.

We next address parents' contention that the services were not adequate because they fell short of Ewell's recommendations. Parents assert that DHS waited several months to provide an in-home mentor rather than immediately providing the intensive, hands-on parenting coaching that Ewell had recommended, and that they were never provided with couples' counseling, nor was father provided with mental health treatment for PTSD. Parents maintain that Wafer's guidance, which they contend was not provided until August 2011, was limited to observation rather than hands-on coaching and that, for all of those reasons, DHS's efforts were not reasonable.

Parents' criticisms of the services provided are not well-taken. Contrary to parents' characterization of the record, DHS facilitated, and a home care nurse actively participated in, extended home visits beginning shortly after Ewell's psychological evaluations; Fulmerton worked with parents to develop parenting skills over several months. During that time, parents also attended intensive parenting classes and worked with a parenting coach during office visits, and mother was provided with mental health services to address stress management techniques.

We also disagree with parents' characterization of Wafer's services as consisting primarily of observation rather than hands-on instruction as recommended by Ewell. Wafer spent a significant amount of time observing mother's and father's natural tendencies in caring for C—but after identifying behaviors that needed correction, she redirected parents and provided specific feedback. On a typical visit, Wafer spent five or six hours with parents and worked with them on C's feeding and sleeping schedule and on creating shopping lists and engaged in other activities related to C's safety and health. After mother and father had engaged in services for several months, there were instances when Wafer refrained from providing feedback until the very end of the visit. At that point, however, it was appropriate for DHS to assess their progress in developing the ability to safely care for C without constant guidance.

At the permanency hearing, the court found that DHS "had given a great deal of time and consideration and

programming to this case" and ultimately determined that DHS's efforts were reasonable. We are satisfied that the record supports that finding and that determination, despite the fact that DHS did not provide every service suggested by Ewell. Ewell's suggestions that father "could probably also benefit from some individual counseling to address his PTSD" and that both parents "might also benefit from couples counseling" did not create a requirement that DHS provide those services. Rather, the juvenile court evaluates DHS's efforts based on a standard of *reasonableness*, and the record supports the court's determination that those efforts were indeed reasonable.

We next address the juvenile court's determination that parents had failed to make sufficient progress to allow for C to safely return home. They contend that they had made sufficient progress, based on the fact that there were no incidents during any of the visits in which either parent became angry or frustrated with C, nor did either ever handle her roughly, and nothing else happened that suggested a continuing risk of harm to C. Rather, in parents' view, the visits were consistently pleasant, and they demonstrated that they were able to protect C. Additionally, parents assert that the court, in determining that they had not made sufficient progress, erroneously relied on specific incidents that did not constitute a threat of serious loss or injury to C.

As part of the support for the juvenile court's determination, DHS points to its report from August 2011, which states, in part:

> "No notable progress has been made in the development of protective capacity necessary to safely parent [C], despite months of intensive services focused on parenting skill development. Parents continue to struggle with retaining information learned and processing information as it relates to their specific circumstances. Additional information indicative of little to no progress:
>
> "Both parents continue to blame their problems on others at times. [Parents] recently felt they are getting criticized by the visitation supervisor for being poor. We had to discuss this at length.

"* * * * *

"Both parents at time[s] reject feedback regarding what must change. Both frequently struggle with being defensive at times. [Father] struggles with focusing on [C] as opposed to focusing on himself (he often spends a lot of time at visits talking with the visitation supervisor about himself). [Father] will often defend parent practices he believes in by talking about how common they are. He struggles with looking at his child's abuse history, age, vulnerability, and stage of development when considering appropriate parenting practices.

"* * * * *

"[Mother] is not emotionally able to intervene to protect her child, as evidenced by her frequent immobilization in response to uncomfortable things she experiences with treatment providers and others, her delayed response and action when she is experiencing problems she, herself, views as significant (such as feeling as though she and her mental health counselor are a horrible match, yet she is at a loss as to what to do to begin to resolve this issue) and her consistent presentation as someone who is consumed with her own fears and anxieties to the point where she can [*sic*] accept and internalize information necessary to safely parent.

"* * * * *

"* * * Neither parent at this time can articulate a plan for keeping [C] safe. Both parents continue to 'guess' as to how [C] sustained serious injuries. Neither parent has the ability to identify and predict what dangers may exist to [C] and how to safeguard her. Neither parent has demonstrated the ability to use sound judgment and reasoning as it pertains to parenting."

(Boldface omitted.)

The state also points to Wafer's extensive visitation notes, covering August to October 2011, to support the juvenile court's determination. Those notes demonstrate some of the same concerns included in the August 2011 report and also indicate that parents had difficulty discerning when C was hungry and when she needed to nap, knowing when and how to keep C from putting things in her mouth,

and following Wafer's suggestions regarding providing the proper structure to ensure C's health and safety.

The record, including the specific examples cited by the juvenile court, supports the determination that parents had failed to make sufficient progress to allow for C to safely return home. The incidents cited by the court—*e.g.*, mother becoming so distracted with dealing with her cats that she failed to notice when C began to eat dog food and both parents having great difficulty removing a crayon from C's mouth—may not indicate a serious risk of harm when viewed in isolation, but in the context of the entire record, those incidents support the court's determination that parents were not progressing in their ability to protect C. We recognize, as did the juvenile court, that cognitive limitations present a unique challenge in this type of case. Indeed, parents' visits with C were generally pleasant and there was no indication that either parent would intentionally harm C; nevertheless, parents' cognitive limitations continually hindered their ability to ensure C's safety and health. Even after months of intensive services, mother and father still had difficulty understanding some of C's very basic needs. The record thus supports the juvenile court's determination that parents had not made sufficient progress to enable C to safely return home.

Finally, parents contend that, even if their progress was not sufficient to allow for C to return home at the time of the permanency hearing, their progress was nevertheless sufficient to allow for such a return within a reasonable time following the provision of additional services. The juvenile court was not required to make a finding on that point *before* changing the permanency plan from reunification to adoption. ORS 419B.476(2)(a); *Department of Human Services v. D. L. H.*, 251 Or App 787, 805, 284 P3d 1233, *modified on recons*, 253 Or App 600, 292 P3d 565 (2012). Nevertheless, a determination of whether the parents' progress is sufficient to allow for the child's return within a reasonable time following the provision of additional services is relevant to the question of whether there is a compelling reason to refrain from filing a petition for termination of parental rights immediately.

Under ORS 419B.476(5)(d), if the court determines that the permanency plan should be adoption, the court's order "shall include" a "determination of whether one of the circumstances in ORS 419B.498(2) is applicable." That statute, in turn, provides that DHS shall file a petition for termination unless, among other reasons, "[t]here is a compelling reason *** for determining that filing such a petition would not be in the best interests of the child," including the fact that the parent "is successfully participating in services that will make it possible for the child *** to safely return home within a reasonable time ***." Accordingly, the juvenile court's evaluation of whether reunification may be possible within a reasonable time is relevant to the *timing* for filing a petition for termination.

The juvenile court here noted that it is unclear whether parents' cognitive limitations "can be remedied in any short-term fashion" but determined that, in all events, parents had not made sufficient progress and would not do so "in the foreseeable future." That determination finds adequate support in the record.

In short, the juvenile court did not err in determining that DHS made reasonable efforts, that mother and father did not make sufficient progress, and that, in view of their cognitive limitations, parents would not make sufficient progress "within a reasonable time" in order for C to safely return home.

Affirmed.