SHORR, J.
*422 *389 In this consolidated juvenile dependency case, mother appeals from three permanency judgments that changed the permanency plans for mother's children (C, D, and E) from reunification to adoption.[1] Mother contends that the juvenile court erred in changing the permanency plans because the court determined whether DHS's efforts were reasonable based, in large part, on DHS's efforts that occurred before the juvenile court announced the basis for jurisdiction and entered dispositional orders. During that prejurisdiction period, mother was unwilling to participate in the services requested by DHS until the court announced the services that mother was required to complete to ameliorate the basis for jurisdiction. Mother maintains that, until jurisdictional and dispositional judgments were entered and she knew which services she was required to complete, the juvenile court could not adequately assess whether DHS's efforts were reasonable to assist mother in ameliorating the basis for jurisdiction. Mother further contends that the juvenile court erred to the extent that it concluded that DHS made reasonable efforts to return the children home during the five-month period after jurisdiction. We agree with mother that, at least based on the circumstances presented in this case, the trial court erred in concluding that DHS made reasonable efforts to safely return her children to her. Accordingly, we reverse the juvenile court's permanency judgments.
The following facts are either procedural or uncontested. This case concerns C, D, and E, who, at the time of the dependency hearing, were nine, seven, and five, respectively. DHS had been involved with mother and her children before the current proceedings that gave rise to this appeal. The juvenile court initially obtained jurisdiction over the children in 2014. The court dismissed jurisdiction in May 2016.
Around that time and into July 2016, DHS began to receive reports that raised concerns about the children's *390 safety. Among other things, there were reports that mother was leaving the children unattended at home while she worked 28 to 32 hours a week at a local grocery store. DHS assessed that the children had significant behavioral issues and mental health needs that required constant supervision to ensure their safety. At times, mother left the children with her domestic partner. There were also reports that mother and her partner engaged in inappropriate disciplinary techniques with the children.
DHS filed a dependency petition on July 26, 2016, that alleged that the juvenile court had jurisdiction over the children based on a number of allegations against mother. Following a shelter hearing, the juvenile court authorized DHS to remove the children, and DHS placed them in foster care. In the meantime, one of the children disclosed in September 2016 that mother's partner had sexually abused her while she and the other children were in mother's care.
The juvenile court originally scheduled a hearing on DHS's dependency petition for September 13, 2016. The hearing was set over several times and eventually rescheduled for November 28, 2016. On the first day of that hearing, the parties informed the court that mother had agreed to admit that she "lacks the parenting skills to safely parent the child[ren]" in exchange for DHS's dismissal of the remaining jurisdictional allegations against her. The court accepted mother's admission, but did not enter any judgments of jurisdiction or disposition. Among other things, DHS and mother could not agree on whether mother should be required to submit to a psychological evaluation.
The juvenile court held a dispositional hearing on March 9, 2017. The court issued a letter opinion a few weeks after that hearing and then entered a judgment of jurisdiction and disposition on April 24, 2017, that took jurisdiction over the children and required that mother comply with all DHS recommendations, including a psychological evaluation. In all, there was approximately nine months between the filing of the dependency petitions on July 26, 2016, and the entry of the *423 judgments of jurisdiction and disposition on April 24, 2017. As noted above, mother refused to participate in the services offered by DHS for that nine-month *391 period and asserted that she was not required to do so until the court decided what services were to be required of her to ameliorate the basis for jurisdiction.
On May 2, 2017, DHS met with mother and provided her with a written "action agreement" that detailed "the changes needed in parental protective capacity" and the "specific actions to be taken over the next 90 days." By all accounts, mother began engaging in the DHS-recommended services after the entry of the judgments of jurisdiction and disposition. Among other things, on June 1, 2017, she began individualized family sexual abuse treatment (for a nonoffender) with her mental health counselor Rebecca Carroll who "absolutely" observed progress in mother during regular sessions from June 2017 forward. Mother also submitted to a psychological evaluation with Daniel Munoz, Ph.D., on June 13, 2017. Munoz conducted a follow-up feedback session with mother, her counsel, and the DHS caseworker on July 18, 2017. Munoz outlined his diagnoses and recommendations, including his recommendation that mother engage in dialectic behavioral therapy (DBT) for an unspecified personality disorder. Munoz believed that DBT programs take at least six months, but "full fidelity DBT" typically lasts for a year.
The caseworker initially had problems finding a certified local DBT provider, but ultimately located Jackie Tasker, the only DBT-certified therapist in the county. Mother began participating in weekly group DBT sessions with Tasker on August 28, 2017. Mother's existing therapist Carroll, who had some training in DBT, recommended that mother start individual DBT therapy with Tasker after Carroll and mother completed their on-going sessions. Tasker's DBT program lasts 24 weeks, but she will repeat it with a client. Meanwhile, the children were in therapeutic foster care in Douglas County and involved in their own individual therapy sessions.
The juvenile court proceeded with permanency hearings on September 19 and 26, 2017, approximately five months after the court's judgment of jurisdiction and disposition. DHS acknowledged that mother was doing well in services but moved the court to change the plan from *392 reunification to adoption. DHS was "concerned that even with the progress that mother has started to demonstrate *** she will not, in a reasonable period of time, be able to meet her children's considerable level needs." The children's psychological evaluators believed that all three children required highly skilled caregivers and should not be required to wait longer for permanency.
At the permanency hearing, both the parties and the juvenile court focused on the substantial nine-month delay that had occurred between the filing of the dependency petitions and the judgments of jurisdiction and disposition. DHS focused on three core services that it had offered mother, including a psychological examination, a nonoffending parenting program, and DBT. DHS acknowledged that mother had refused to participate in those services before jurisdiction and disposition but had engaged in them after that point. DHS also acknowledged that mother was making progress in DBT and demonstrating change, but DBT required six to 12 months and mother had delayed engaging in DBT until after jurisdiction was determined. In response, mother argued that the nine-month delay could not be attributed to mother and she had a right to contest dispositional issues during that period. She further argued that she had been successfully engaging in services for the five months post-jurisdiction and disposition, but five months was not a reasonable time period for DHS to offer services.
The juvenile court noted that the delay until the entry of the jurisdiction and dispositional judgments was unusually long, and it allocated responsibility for that delay among all involved:
"[This is] one of the few [dependency] cases that has ever had the number of delays and processing, *** but it is what it is.
"*** [T]his is the only case I know of where there was ever a contested disposition. And there was another huge delay in *424 determining what services *** the court would ultimately order in this case.
"So I want to make sure that's on the record in terms of some of the comments that were made on behalf of Mother's *393 counsel in determining the delay in services and what's transpired in this case. Because I will tell you, the Court has a responsibility as part of this, but so does Mother in this case, and so does the State, DHS ***."
The court proceeded to consider all of the services that DHS had offered to mother, including during the prejurisdiction period in which mother refused services. Based on that consideration, the court concluded that DHS had made reasonable efforts to return the children to mother's home. As noted at the outset of this opinion, the juvenile court ultimately changed the permanency plans from reunification to adoption.
Mother assigns error to the juvenile court's decision to change the permanency plans from reunification to adoption for each of the three children, arguing that those decisions were based on an incorrect legal conclusion that DHS had made reasonable efforts to safely return her children to her home. Whether the facts are sufficient to prove that DHS's efforts were reasonable is a legal conclusion that we review for legal error. Dept. of Human Services v. A. D. , 255 Or. App. 567, 569, 300 P.3d 185, rev. den. , 354 Or. 342, 313 P.3d 1126 (2013).
The juvenile court encounters a number of decisions at the time of the permanency hearing, depending on the nature of the case plan for the child. Here, the case plan at the time of the permanency hearing was to reunify the children with their mother. Under ORS 419B.476(2)(a), if the case plan is reunification, the court shall "determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home." See also A. D. , 255 Or. App. at 574, 300 P.3d 185 (stating the two statutory elements required to change permanency plan if case plan at time of permanency hearing is reunification). DHS has the burden of proving both elements by a preponderance of the evidence. Dept. of Human Services v. S. M. H. , 283 Or. App. 295, 305, 388 P.3d 1204 (2017). In making the reasonable efforts determination, "the court shall consider the ward's health and safety the paramount concerns." ORS 419B.476(2)(a).
*394 Mother contends that the juvenile court erred in concluding that DHS met its burden to establish the first element of ORS 419B.476(2)(a), that DHS made reasonable efforts to safely return the children home. Mother essentially argues that the juvenile court erred in considering the prejurisdiction efforts by DHS because, until jurisdiction was determined, she was not required to engage in services and, significantly, the court could not assess whether DHS was providing mother with a reasonable opportunity to ameliorate the original basis for jurisdiction.
"The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it has required parents to take are reasonable." Dept. of Human Services v. T. R. , 251 Or. App. 6, 13, 282 P.3d 969 (2012). DHS's efforts are reasonable "only if DHS has given the parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." S. M. H. , 283 Or. App. at 306, 388 P.3d 1204 (internal quotation marks omitted). We have concluded that the issues of parental unfitness established in the jurisdictional judgment provide the framework for the juvenile court's analysis of DHS's reasonable efforts-as well as its analysis of the parent's progress to make it possible to return the child home safely. Dept. of Human Services v. N. T. , 247 Or. App. 706, 715, 271 P.3d 143 (2012). "Both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction." Id . ; see also Dept. of Human Services v. S. S. , 278 Or. App. 725, 738, 375 P.3d 556 (2016) (noting that the juvenile court must evaluate DHS's efforts in light of "the particular circumstances of the case" and "particularly the adjudicated bases for jurisdiction"). Reasonableness is measured "through the *425 lens of" the adjudicated basis for jurisdiction. S. M. H. , 283 Or. App. at 305, 388 P.3d 1204. "DHS's efforts are evaluated over the entire duration of the case, with an emphasis on a period before the [permanency] hearing sufficient in length to afford a good opportunity to assess parental progress." Id . at 306, 388 P.3d 1204 (internal quotation marks omitted).
The challenge presented by this case is that, as the juvenile court noted, there was an unusually long delay between the filing of the dependency petitions and the entry *395 of the jurisdictional and dispositional judgments. That period lasted nine months. Oregon juvenile law contemplates a much shorter time.[2] In those more typical circumstances where jurisdiction is decided quickly, DHS's prejurisdiction efforts may not comprise as much of the total efforts made throughout the life of the case. The juvenile court allocated responsibility for that unusual delay to the parties and the court. During that period, mother would not consent to engage in the offered services because she disputed that they were necessary, and she opted to wait for the jurisdictional and dispositional judgments to find out what would be required of her to ameliorate the basis for jurisdiction. As DHS acknowledges, mother was not obligated to engage in services before the entry of the jurisdictional and dispositional judgments that required her to do so.
More importantly, under the facts of this case, where mother contested the dispositional requirements and, due to a number of factors, waited nine months for a judgment of jurisdiction and disposition to define her obligations, the juvenile court could not, at least until that point, adequately assess whether DHS's efforts were reasonable to assist mother in ameliorating the basis for jurisdiction and becoming a minimally adequate parent.[3] Under those facts, the juvenile court could not assess whether DHS's efforts were reasonable "through the lens" of the adjudicated basis for jurisdiction until such jurisdiction was established and the dispositional order required mother to engage in services.
DHS correctly notes that we analyze the reasonableness of DHS's efforts based on the totality of circumstances *396 "over the life of the case" and have, on a number of occasions, considered services offered by DHS immediately after removal of the children and well before jurisdiction. See Dept. of Human Services v. S. W. , 267 Or. App. 277, 290, 340 P.3d 675 (2014) (stating juvenile court was required to evaluate DHS's reasonable efforts "over the life of this case"); State ex rel. Dept. of Human Services v. E. K. , 230 Or. App. 63, 78, 214 P.3d 58, rev. den. , 347 Or. 348, 222 P.3d 29 (2009) (considering DHS's efforts made before and after removal of children as part of reasonable efforts analysis); State ex rel. SOSCF v. Frazier , 152 Or. App. 568, 582, 955 P.2d 272, rev. den. , 327 Or. 305, 966 P.2d 220 (1998) (stating same in a case involving termination of parental rights).
As we note above, the sufficiency of DHS's reasonable efforts are analyzed based on "the particular circumstances of each case" and "particularly the adjudicated bases for jurisdiction." S. S. , 278 Or. App. at 738, 375 P.3d 556. As those cases demonstrate, there are circumstances where the juvenile court appropriately considers DHS's efforts undertaken before entry of the jurisdictional judgment. See, e.g. , ORS 419B.340(1) (requiring DHS to make reasonable efforts from the very beginning of the case). However, none of the cases cited by DHS involves the unusual circumstances presented here. Because mother contested the need for services and *426 the jurisdictional judgments were delayed for nine months, the juvenile court erred in concluding that it could consider the time period before the entry of the jurisdictional and dispositional judgments as part of a "period before the [permanency] hearing sufficient in length to afford a good opportunity to assess parental progress." S. M. H. , 283 Or. App. at 306, 388 P.3d 1204. Although that time period was long, it provided no opportunity for the court to assess mother's progress because mother disputed that she needed services and the court had not yet resolved the dispute. Under those circumstances, DHS's efforts during that period were not appropriately part of the "reasonable efforts" analysis under ORS 419B.476(2)(a).
We turn to a review of the efforts to return the children to mother that DHS undertook after the entry of the jurisdictional and dispositional judgments. It is not clear to us that the juvenile court ever considered whether DHS's *397 efforts made solely after jurisdiction and disposition were sufficient under ORS 419B.476(2)(a) to be reasonable efforts to return the children safely home. However, even assuming that it did, we conclude that DHS's efforts made only after the entry of the jurisdiction and disposition judgments were insufficient for the trial court to conclude that DHS made "reasonable efforts" for purposes of ORS 419B.476 (2)(a), given the short time frame that the court had to assess mother's progress and mother's limited opportunity to engage in the services offered.
DHS contended before the juvenile court that one of the three primary services necessary for mother to become a minimally adequate parent was her successful participation in DBT. Due to a number of factors discussed above, most of which are either factually or legally not attributable to mother, mother did not participate in DBT sessions with a certified DBT therapist until about one month before the permanency hearing. DHS acknowledged that mother was making progress in DBT during that limited time and otherwise was largely engaged in the services that DHS required that she engage in after the jurisdictional judgment. In light of those circumstances, we conclude that the one-month period of DBT was not "sufficient in length to afford a good opportunity to assess parental progress." S. M. H. , 283 Or. App. at 306, 388 P.3d 1204 ; see also S. S. , 278 Or. App. at 737, 375 P.3d 556 (concluding that DHS's efforts to reunify the family were "too short *** to allow the court to meaningfully assess whether the family was making progress toward reunification"). As a result, the juvenile court erred in concluding that, at least at the point of the permanency hearing, DHS had made reasonable efforts under ORS 419B.476(2)(a).
Reversed and remanded.

Father is not a party to this appeal and did not contest DHS's request to change the permanency plans to adoption.

Oregon's juvenile code contemplates that a court will hold a hearing "no later than 60 days after a petition alleging that a child is within the jurisdiction of the court," ORS 419B.305(1), and that it will enter a dispositional order at the "termination of the hearing," ORS 419B.325(1). Upon a written order supported by findings of good cause, the court may continue the consideration of the petition beyond 60 days. ORS 419B.305(1).

That does not mean that DHS can withhold reasonable efforts until the juvenile court obtains jurisdiction over the child. DHS's obligation to undertake reasonable efforts to return the child safely to his or her home begins before jurisdiction. See, e.g. , ORS 419B.340(1) (noting that, if the court awards custody to DHS, the court shall include in the disposition order "whether [DHS] has made reasonable efforts *** to eliminate the need for removal of the ward from the home [or] *** to make it possible for the ward to safely return home").