Argued and submitted April 18, affirmed June 27, petition for review denied
October 4, 2012 (352 Or 564)

In the Matter of L. P. R.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. N.,
*Appellant.*

Josephine County Circuit Court
090223J;
Petition Number 090223J01;
A149584

282 P3d 901

Megan L. Jacquot argued the cause and filed the brief for appellant.

Rebecca M. Johansen, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

## SERCOMBE, J.

Father appeals a permanency judgment that changed the permanency plan for his daughter, L, from reunification to placement with a fit and willing relative through establishment of a permanent guardianship. In the judgment, the juvenile court determined that the Department of Human Services (DHS) had made reasonable efforts to reunify L with father and that father had not made sufficient progress to make it possible for L to return home within a reasonable time. We conclude that the juvenile court did not err as a matter of law and, therefore, affirm.

Father does not request that we exercise our discretion to conduct *de novo* review in this case, and we perceive no reason to do so. *See* ORAP 5.40(8)(c) (the court will exercise discretion to try the cause anew on the record only in exceptional cases). Accordingly, we "review the juvenile court's legal conclusions for errors of law but are bound by its findings of historical fact if there is any evidence in the record to support them." *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012). In light of that standard, we state the facts consistently with the trial court's express and implied findings, as supplemented with uncontroverted facts from the record. *See State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010).

L, who was born on December 5, 2005, was conceived when father was 58 years old and mother was 16. Several years later, in October 2009, DHS removed L from mother's home because she had been physically abused by mother's boyfriend and mother was abusing drugs and alcohol. Father did not live in the home and was not involved in L's care at that time. Because he had not been established as L's legal father, father was not named in the original jurisdictional petition.

After his adult daughters helped him locate L, father spoke with the caseworker involved in her case. The caseworker advised father that she could not give him details about the case until he established paternity and referred him to the child support division. Father obtained an order establishing paternity on April 28, 2010, and, thereafter, was

added to the jurisdictional petition. The petition alleged and, in July 2010, father admitted, that father was aware of the nature of the allegations relating to mother and had done nothing to assert custody of L and that father's mental health problems interfered with his ability to safely parent and protect L.

The court ordered father to complete a psychological evaluation and to participate in services recommended as a result of that evaluation. Although father's attorney initially requested that certain psychologists not conduct the evaluation and father declined to attend two scheduled evaluations because they were too far away, ultimately, in November and December 2010, Dr. Eric Morrell, a clinical psychologist, completed a comprehensive psychological evaluation of father.

Morrell diagnosed father as having paranoid personality disorder with "schizoid and suspected antisocial tendencies." As a result of that disorder, father views the world around him as being very threatening and, accordingly, father tends to react to situations inappropriately and misinterpret others' "benign behaviors" and see them as "malignant and manipulative." He projects blame rather than accepting responsibility for his actions. According to Morrell, there is no effective treatment for father's personality disorder. In addition to diagnosing paranoid personality disorder, Morrell gave father several "rule out" diagnoses. In other words, Morrell determined that there was a reasonable probability that father had the conditions, but did not have enough information to give a certain diagnosis as to any of them. The "rule out" diagnoses were for post-traumatic stress disorder (PTSD), intermittent explosive disorder, a cognitive disorder caused by multiple head injuries, and alcohol dependence. A person with intermittent explosive disorder is unpredictable and, out of nowhere, can become very violent and angry. According to Morrell, father has a "very threatening verbal style" and is someone with "a significant amount of agitation, anger, and suspiciousness." Although father had an average intellect and should, therefore, be capable of using good judgment, Morrell also noted father's significant failures to use good judgment. Morrell pointed out that father's decision to become sexually involved with a 16-year-old girl at the age of 58 is an example of "deplorable" judgment.

As a result of father's mental health issues, Morrell recommended that L not be placed with father. According to Morrell, although father is protective of and loyal to L, "given his personality-disordered features, volatility, social impairment and itinerant history," father would not be suitable as a primary caregiver for L. Morrell opined that the possibility that L might be placed with a suitable relative "would allow for the child to have exposure to the positive qualities [father] can offer, while giving her a safer, steadily protective, and healthier full-spectrum environment in which to be raised." With respect to services, Morrell opined that father would not respond well. He stated that "[m]ental health intervention would invariably be low yield, and thus is not recommended." However, Morrell stated that parenting training might "potentially provide benefits, as it is more educational in nature and presumably less threatening." Morrell did not "recommend it for the purposes of reunification because [he] just [did not] think [father] would be an appropriate placement resource." Instead, he saw parenting classes as a service that could "instill in [father] a little bit of * * * gentility and some skills in any interactions he might have with his daughter."

At the time of the evaluation, Morrell had been provided with a psychological evaluation of father completed in 2001 by Dr. Grant Rawlins. Rawlins's report is relatively consistent with Morrell's assessment. Rawlins diagnosed father as having intermittent explosive disorder and noted father's "irritable and aggressive" attitude and uncooperativeness in the testing process. According to Rawlins, father exhibited "poor social judgment, impulsivity, and * * * probable brain damage" that might be related to his "impulsivity and difficulty with control of his anger." Rawlins also diagnosed father with a severe personality disorder "with schizoid, antisocial and paranoid traits."

The testimony of father's adult daughter, Dysart, was consistent with Morrell's assessments of father. According to Dysart, father would frequently get angry, becoming "irate" and "scream and yell." She described that father would "rant about wars and killing people and knives and some pretty harsh things." When talking with Dysart, father threatened violence to the social worker on L's case as well as the social worker's child and his own prior attorney. His

threats ranged from "physically hurting people, to shooting people, to using * * * some sort of combat * * * thing." According to Dysart, when challenged, father would "blow up" and scream and use obscenities. She also described that he would become ranting and loud even with children present. As a result of father's anger and hostility, Dysart testified that she had not spoken to father for several months before the permanency hearing.

DHS staff that worked on this case confirmed that father was frequently angry and difficult to deal with and that, when angry, father could become threatening. Even the caseworker assigned to the case at the time of the hearing, with whom father had a fairly good relationship, indicated that father had expressed his frustrations to the caseworker in a threatening manner. According to the caseworker, he was able to get along with father because he did not take the things father said personally; however, father "doesn't seem to understand necessarily what other people feel in reaction to the things he says." Indeed, in his own testimony, father affirmed that he deals with anger and frustration by raising his voice and venting. He stated that, although he "might scream and holler at you," "nobody will ever see, not one incident" in which he has physically harmed someone in anger.

After the evaluation with Morrell, DHS referred father to a 10-week parenting class. Father had perfect attendance at the class and did very well. He participated in class and appeared to be interested in the information presented. The instructor did not observe father display extreme emotion during the classes. During the course of the class, the instructor observed a visit between father and L and opined that father had displayed model parenting during the visit; he was very nurturing and appropriate.

During the course of the dependency case, after his paternity was established, father had weekly supervised visits with L. Although the caseworker offered father gas vouchers for the visits, father typically refused the vouchers. For the most part, father's visits with L went very well. He never missed a visit and would bring snacks and gifts that were appropriate for L. During the visits, father was caring and played with L. He was able to handle L's sometimes difficult

behavior and was calm and loving with her. However, on one occasion, father lost his temper at a DHS worker in L's presence. On that occasion, he became threatening and the DHS worker who was supervising the visit believed that he was unsafe to be around L and removed L from the situation. After that incident, L was frightened of father for some time. Although many of the supervised visits took place in a DHS visit room, some were conducted at the park and the caseworker arranged, on two occasions, for L to attend pow wows with father. The caseworker consulted with Morrell to determine whether there were any other services that might help father, and Morrell indicated that he did not believe that there was anything else that could be offered to father that would be helpful.

As noted, L had been physically abused. Dr. Maureen Mahoney, a child psychotherapist, diagnosed L with PTSD and also indicated that she had oppositional defiant behaviors, sleep disturbance, and anxiety. L was very fearful and "hyper vigilant to sound." She had flashbacks of abuse and was very anxious about being safe. Mahoney treated L for approximately a year and, during treatment, L made good progress although she had setbacks at times. Mahoney opined that L needed a safe, secure, loving home with a caregiver who would be predictable and "create an environment of stability." Due to the physical abuse that L had suffered and her resultant hyper-vigilance to sound, "screaming or yelling in a household would be disturbing to her" and detrimental to L even if the anger were not directed at her. In addition, loud noise would be "particularly threatening to her."

At the permanency hearing, DHS requested that the juvenile court change the permanency plan from reunification to adoption. However, the caseworker testified that, although he did not think father should be the primary caregiver for L, he believed it was important for them to maintain the bond that they had formed. Father asserted that L should be returned to him. However, the child's attorney and the court-appointed special advocate took the position that L should not be returned to father.

At the conclusion of the hearing, the juvenile court announced its ruling:

> "This is a difficult case as you all know because [father] seems to give an indication that he is going to be there this time around. At the same time life for this child is not supposed to be experimental. She needs stability, she needs security, she needs love, she gets that from dad. She, she needs a lot of things. She's, despite her, her very strong personality and, and stubbornness, underlying that are some very serious concerns. She's been diagnosed with PTSD, oppositional defiant behavior, and I'm very fearful of what may happen in the future given those special needs and given her father's personality which is very much like hers. There's a lot of speculation involved in that. But the bottom line is, I have to agree that it's not reasonable to think that this child can be returned to father's care in the reasonable, in, in the near terms, in the future * * * within a reasonable time frame. She needs permanency, she needs permanency now and father can't give her that."

The court observed that

> "what I came down to are the things, Dr. Morrell brings them out, the facts of this case bring them out. There's an essential level of extremely poor judgment and, and how, how you can get involved with a 15 year old and end up having a baby with her * * *. There's just a, a judgment issue here that if you haven't learned good judgment by the time you're in your 20's, you're not going to learn them in your 60's. [The caseworker's] testimony really was very succinctly and very well brought this all out. And, and what it comes down to is father is seeking to meet his own needs by having this child, by raising this child, not, not the child's needs."

The court was not convinced by the "90 minute visit[s] once a week" that father could appropriately parent L day to day. The court also found that DHS made reasonable efforts and that "this child cannot go home to father in any reasonable time frame." In the permanency judgment, the court determined that, although father "clearly loves his child, he is not capable of providing the stable, consistent, predictable environment necessary for the child's health and safety. As indicated by Dr. Morrell, father's mental health issues and impaired judgment make it not possible for [L] to return

home within a reasonable period of time." However, as to DHS's request that the plan be changed to adoption, the court observed that it was

"concerned about moving to that plan, landing on that plan because there's, there is a family relationship between father and this child and I'm very concerned about breaking it. I think it needs to be preserved. I think one of the things, it's been commented on, one of, one of the things that father and daughter have in common is this defiant kind of personality. And seems to me in the long run, [L is] going to benefit from knowing that her father is that same way and he will help her through this, help her through it, hopefully without her getting into legal trouble, without, without getting into situations that, by having a, knowing that father's been there, I mean children don't do what their parents say, but at the same time she'll know that, 'Hey, I'm not weird. At least no weirder than my dad.' And that ought to be helpful to her. And granted the plan, * * * the proposed plan is placement with the sister which keeps the family relationship, but the Court can't make a direction [that] this plan is [in] play as long as she goes with Echo. If I change the plan to adoption, then, then she's up for adoption. * * * [B]ecause of the strong value of protecting, preserving the family relationship, * * * we ought to go to the next level plan which is placement with, with a fit and willing relative."

Thus, ultimately the court found that "the relationship is a good one, [and] ought to be protected, * * * it ought to be retained." Accordingly, it changed the plan to placement with a fit and willing relative, concluding that L could not be safely returned to her parent but that adoption was not appropriate under the circumstances. The permanency judgment provides:

"5.  Giving paramount consideration to the ward's health and safety, DHS has made reasonable efforts to make it possible for the ward to safely return home. Those efforts include: 3 different referrals for psychological evaluations with three different psychologists. DHS offered transportation and lodging arrangements for the out of area evaluations. Additionally, DHS arranged for regular visitation with the child and offered father gas vouchers to assist with transportation to and from visits. Efforts are further described in the Reasonable/Diligent Efforts

Attachment, which is attached as Exhibit 1 to this Order and Judgment and incorporated herein.

"6. Giving paramount consideration to the ward's health and safety, the ward's father has not made sufficient progress to make it possible for the ward to safely return home. Initially father refused to sign releases which would allow the caseworker to refer father for a psychological evaluation. Although the agency referred father for a psychological evaluation in August, 2010, father refused to complete the evaluation with the arranged provider. Father was referred for a second psychological evaluation and again refused to complete the evaluation. DHS referred father for a 3rd psychological evaluation and he completed the evaluation with Dr. Morrell on November 22 and December 7, 2010. [Father] also completed a 10 week parenting class.

"[L] suffers from Post Traumatic Stress Disorder, likely caused by physical abuse by her 1/2 siblings' father. Although[ ] [father] clearly loves his child, he is not capable of providing the stable, consistent and predictable environment necessary for the child's health and safety. As indicated by Dr. Morrell, father's mental health issues and impaired judgment make it not possible for [L] to return safely home within a reasonable period of time."

As noted, father asserts that the "court erred in finding that father had not made sufficient progress to allow the child to return home at the time of the hearing, or within a reasonable time thereafter." The state responds that the juvenile court "did not err in changing the plan from return to parent to permanent placement with a fit and willing relative through establishment of a legal guardianship."

At a permanency hearing,

"[if] the case plan at the time of the hearing is to reunify the family, [the juvenile court must] determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.476(2)(a). Thus, in order to change the permanency plan, the juvenile court must determine that (1) DHS has made reasonable efforts to make it possible for the child to return safely home and (2) despite those efforts, the parent has not made sufficient progress to allow the child to return safely home.

"The particular circumstances of each case dictate the type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable[.]" *N. S.*, 246 Or at 349-50 (internal quotation marks omitted). In view of that standard, we agree with the juvenile court that, under the particular circumstances presented in this case, DHS made reasonable efforts. Father's mental health was one of the paramount concerns in this case. Accordingly, DHS referred father for a psychological evaluation to determine what services might provide a benefit to him. Indeed, as the juvenile court noted in its judgment, DHS provided father with "3 different referrals for psychological evaluations with three different psychologists" and "offered transportation and lodging arrangements for the out of area evaluations." After the psychologist who evaluated father opined that father's personality disorder could not be effectively treated and that mental health treatment was not recommended because father would not respond well and such treatment would "invariably be low yield," DHS nonetheless provided father with a 10-week parenting class that the psychologist noted might provide some benefit. In addition, DHS provided weekly supervised visits with L and offered father gas vouchers in the event that he needed them to allow him to attend visits. Although the caseworker consulted with Morrell to determine whether there were any additional services that might be useful to father, no such services could be identified. Given all the circumstances, and especially in view of the psychologist's assessment of father's mental health issues, prognosis, and the likely effectiveness of any services, we cannot say that the trial court committed legal error in determining DHS's efforts were reasonable.[1]

---

[1] Father, in his brief, lists some services that were not provided and that he contends may have been helpful to him. We note initially that father did not raise that contention before the juvenile court. In any event, however, even if there were additional services that could have been provided, the trial court did not err in concluding that DHS made reasonable efforts under the circumstances of this case.

Thus, we next address the juvenile court's determination that father had failed to make sufficient progress to make it possible for L to safely return home within a reasonable time. "As we have previously explained, a parent's mere participation in services * * * is not sufficient to establish adequate progress toward reunification. Rather, ORS 419B.476(2)(a) requires us to focus on the child's health and safety." *N. S.*, 246 Or App at 351 (internal quotation marks, brackets, and citation omitted).

Here, father eventually completed a psychological evaluation. In addition, he successfully completed a parenting class and faithfully attended visits with L, where, for the most part, he acted appropriately and did well with L. However, completion of those services does not mean that he made sufficient progress to make it possible for L to return home. Indeed, regardless of those services, Morrell opined that, as a result of his mental health issues, father is paranoid and angry, projects blame, feels threatened by the world around him, and can be threatening. When father is angry, he becomes "irate" and yells and, on occasion, even makes violent threats. Furthermore, father has shown significant poor judgment. Given that father's personality disorder is untreatable, along with the effect of father's other mental health issues, Morrell did not believe that L could be placed with him and, further, did not believe that any services could make father a suitable placement for L. Morrell's assessment appears to be borne out by father's conduct in acting in angry and threatening ways toward workers involved in this case, his conduct in conversations with Dysart in which he became angry, irate, and threatening, and father's own affirmation that, when he is angry and frustrated, he yells and "vents."

At the same time, L's history of physical abuse and resultant PTSD make her hyper-vigilant to sound. Accordingly, an atmosphere in which there was screaming and yelling, even if that yelling were not directed at L, would be extremely threatening and detrimental to L. Given that reality, even in view of father's positive visits with L and his good performance in the parenting class, the juvenile court did not err as a matter of law in determining that father failed to make sufficient progress to allow L to be returned to him within any reasonable period of time.

Thus, we conclude that the juvenile court did not err in changing the permanency plan in this case from reunification to guardianship.

Affirmed.