Argued and submitted May 1, reversed July 3, 2013

In the Matter of R. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. K.,
*Appellant.*

Klamath County Circuit Court
0800127JV3;
Petition Number 1100113M;
A153090

306 P3d 763

Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jake J. Hogue, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

## HADLOCK, J.

This juvenile dependency case involves a plan for reunifying a young child, R, with his father, who was, at the pertinent times, incarcerated on convictions related to his sexual abuse of a minor. Father appeals from a permanency judgment in which the juvenile court (1) continued the permanency plan for reunifying father and R and (2) determined that father had not made sufficient progress for R to safely return home, despite reasonable efforts by the Department of Human Services (DHS). The court determined that DHS's reunification efforts had been reasonable even though the agency had declined to provide father with a psychosexual evaluation, which was needed "to determine whether he present[ed] a danger" to R. On appeal, father challenges both the juvenile court's "reasonable efforts" and "sufficient progress" determinations. We conclude that the juvenile court did not consider all pertinent circumstances when it evaluated whether DHS had made reasonable efforts to reunite father and R and, moreover, that the record does not include evidence that would support a "reasonable efforts" determination based on the totality of the circumstances. Accordingly, we reverse.

Father does not ask us to exercise our discretion to conduct *de novo* review, and we perceive no reason to do so. *See* ORAP 5.40(8)(c) (this court will exercise discretion to try the cause anew on the record only in exceptional cases). Accordingly, we apply the same standards of review that we did in *Dept. of Human Services v. J. F. D.*, 255 Or App 742, 744, 298 P3d 653 (2013), another case in which we reviewed a juvenile court's "reasonable efforts" determination:

> "We review findings of fact (for example, what DHS did or did not do) for any evidence, and conclusions of law (in particular, whether the historical facts constitute reasonable efforts) for legal error."

*See also Dept. of Human Services v. T. C. A.*, 251 Or App 407, 414-15, 283 P3d 956, *rev den*, 352 Or 665 (2012) ("We review the court's [reasonable efforts] determination under ORS 419B.476(2) for legal error * * *."); *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) (we are bound by the court's findings of

historical fact if there is "any evidence" in the record to support them).

We state the facts consistently with the juvenile court's findings, supplemented by uncontroverted information in the record, *T. C. A.*, 251 Or App at 410, and we focus on those events that are relevant to father. R was born in 2007 and is father's only child with mother. As of April 2011, DHS had jurisdiction over R based on mother's circumstances.[1] In February 2012, DHS filed a new petition alleging additional bases for jurisdiction relating to father, who was incarcerated and had not had regular contact with R:

"1.   The father * * * is currently incarcerated and unavailable to parent in the foreseeable future. This condition places the child under a threat of harm.

"2.   The father * * * is a convicted, untreated sex offender. This condition places the child under a threat of harm.

"3.   The father * * * [was] unable to maintain a parent-child relationship and has failed to maintain regular contact with the child. This condition places the child under a threat of harm."

The juvenile court found that the state had proved the first two allegations and entered a new jurisdictional judgment. At an October 2012 permanency hearing concerning R and his half-siblings, who were then in foster care,[2] DHS requested a six-month extension of the permanency plan of reunification.

At the time of the permanency hearing, father was incarcerated at the Warner Creek Correctional Facility in Lakeview on convictions related to sexual contact he had with a minor female over two years, beginning when she was 15 years old and he was 25. Father expected to be released in November 2013. While in prison, father had completed

---

[1] By that time, DHS had removed R and his half-siblings from mother's care on several occasions, initially because of domestic violence committed in their presence, and later because of mother's substance abuse, issues with domestic violence, neglect of the children, and history of involvement with the agency.

[2] DHS had returned R and his half-siblings to mother's care in March 2012. In August 2012, the agency once again removed the children from mother's home because she and her newborn had both tested positive for methamphetamine.

courses on parenting and anger management, and he also had enrolled in a "cognitive thinking errors" group. DHS had allowed father to write to R while he was incarcerated, and father had sent "a couple" of letters by the time of the hearing.

A DHS caseworker testified at the permanency hearing that R had met father when R was an infant, but did not remember him at the time of the hearing. Consequently, the caseworker agreed, services aimed at developing a relationship between the two would "be a good thing." DHS wanted father to visit with R, but the agency "would ask that [father] complete [a psychosexual evaluation] prior to engaging in visitation * * * because [it] would want to determine whether or not he would be a threat of harm to [R's] safety." According to the caseworker, the results of that evaluation would determine whether father could safely have visitation with R—either in prison or after his release—or would first need services:

> "If the psychosexual recommends that there are no risk factors, that there is no worry of * * * any kind of threat of harm to [R], then * * * we'd look at visitation at that time; however, * * * if [the evaluation] says that there is a risk factor, then we would have to, based on the recommendations of that evaluation, if there's services that [might] eradicate the risk, then we would definitely ask [father] to do services at that point."

The caseworker also testified that, given R's attachment issues and "sexualized behaviors," R might need his own assessment before DHS could approve visitation. The caseworker opined that undergoing a psychosexual evaluation was the "key element" in father progressing toward reunification with R.

Nonetheless, the caseworker acknowledged, father had not yet been evaluated. Although the caseworker had found one doctor who was willing to evaluate father at the Lakeview prison, that doctor wanted to perform the evaluation on a Saturday, and, according to the caseworker, father's prison counselor "didn't know if that was feasible."

In addition, the caseworker explained, the doctor with whom she had spoken would charge $5,000 to perform the

psychosexual evaluation while father was incarcerated, in comparison to the "less than $1,000" that DHS usually would pay for such an evaluation. The caseworker speculated that the higher cost might relate to the doctor's travel expenses or to his desire to perform the evaluation on a weekend. Because of the high proposed charge, the caseworker still was searching for other doctors and thus was "still looking into the logistics of making a psychosexual happen here[.]"

Father objected to DHS's apparent plan to delay the psychosexual evaluation, pointing out that he would be released in a year, and declaring that a "clean psychosexual evaluation" was likely "under the circumstances and nature of his conviction[.]" Father asserted that, after the evaluation, he would "be in a position to be a parental resource * * * for [R] within a relatively short period of time upon his release." He argued that "the one roadblock" to his progress towards reunification was the delay in obtaining the psychosexual evaluation and, therefore, that DHS should arrange for the evaluation to occur promptly, despite the cost. For its part, DHS responded that it had a "limited pot from which to take money" for evaluations and that, without undue harm to father's reunification plan, he could wait to undergo a "more reasonably priced" evaluation after his release. According to DHS, $5,000 "would probably be the cost of two or three psychosexual examinations where a father or a parent was out of prison."[3]

The juvenile court decided that DHS was not required to pay $5,000 to have father evaluated in prison:

"[W]ith respect to the issue of reasonableness and the $5,000, * * * the objection is denied. I think it is—if it's that sort of cost, that the State should not be required to expend the funds."

Thus, the court determined that DHS's efforts toward reunification had been reasonable:

"DHS has made, for [R], reasonable efforts * * * to make it possible for the ward[ ] to safely return home. * * * For

---

[3] At the hearing, no one questioned the apparent discrepancy between the caseworker's initial testimony that a psychosexual evaluation typically costs less than $1,000 and the state's later assertion that $5,000 would probably cover the cost of "two or three" evaluations performed outside the prison setting.

[father], those efforts include: Communication with father's prison counselor regarding available programs for father and inquiring whether it would be feasible to arrange for father to have a psychosexual evaluation while in prison. [R] also may communicate through letters and [DHS] will determine in the future whether it will be healthy for the ward to visit father in prison.

"* * * * *

"Reasonable efforts do not require [DHS] to offer [father] a psychosexual evaluation while he is in prison if the cost is $5,000. If the cost is reasonable and feasible, [father] will submit to a psychosexual evaluation."

The court also concluded that father had not made sufficient progress toward reunification:

"[Father] has not made sufficient progress to make it possible for the ward to safe[l]y return home. Father is incarcerated and will not be released for another year. Father is a sex offender and needs a psychosexual examination to determine whether he presents a danger to the ward."

Ultimately, the court granted DHS's request for a six-month extension of the permanency plan for reunification.

On appeal, father does not challenge the juvenile court's extension of the reunification plan, but he does assign error to the court's determinations about DHS's efforts and his progress. In his first assignment of error, father argues that the court erred in determining that DHS had made reasonable efforts to make reunification possible. According to father, because DHS had made the psychosexual evaluation a prerequisite for visitation with R, it should have arranged for father to be evaluated "within a reasonable time"—*i.e.*, while he was incarcerated—and, because the timing of the evaluation was critical, "regardless of cost." In response, DHS asserts that its postponement of the evaluation was reasonable because the only doctor who had expressed willingness to evaluate father at the Lakeview prison had demanded payment of "more than five times the amount that DHS usually pays for evaluations outside of prison[,]" so the caseworker had continued to search for a provider willing to evaluate father at a lower cost.

Our analysis of the parties' arguments begins with ORS 419B.476, which governs permanency hearings. The statute provides that, when "the case plan at the time of the hearing is to reunify the family," the court must "determine whether [DHS] has made reasonable efforts *** and whether the parent has made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a). In making that determination, "the court shall consider the ward's health and safety the paramount concerns." ORS 419B.476(2)(a). As we have explained, "[t]he type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998); *see, e.g., id.* at 583 (concluding that DHS's efforts were reasonable where "[t]he record establishe[d] that [the] father was offered significant opportunities to develop and demonstrate his parenting skills and to improve his mental condition").

The difficulty with both parties' positions on appeal, as well as with the juvenile court's analysis, is that they do not grapple with *all* of the pertinent circumstances. Certainly the expense associated with provision of services is a factor that DHS and the courts reasonably may consider; we reject without further discussion father's suggestion that DHS must "fund the services it required, regardless of cost." However, we also reject DHS's suggestion that evidence of a greater-than-usual cost in providing services aimed at reunification is enough, standing alone, to justify a decision not to provide those services. Rather, when a parent complains that DHS has not provided adequate services, a court making a "reasonable efforts" determination must consider not only the burdens that the state would shoulder in providing those services, but also what benefit might reasonably be expected to flow from them.

Several of our cases highlight the importance of considering whether a parent is likely to benefit from a service. For example, when a parent is unable to benefit from services or has demonstrated an unwillingness to participate in programs, DHS may reasonably stop providing those services,

or decide not to provide others. *See, e.g., Dept. of Human Services v. S. N.*, 250 Or App 708, 717, 282 P3d 901, *rev den*, 352 Or 564 (2012) (trial court did not err in determining that DHS's efforts were reasonable, despite agency's decision not to provide the father with mental health treatment that a psychologist opined would "invariably be low yield"); *State ex rel Dept. of Human Services v. J. A. C.*, 216 Or App 268, 280, 172 P3d 295 (2007) (DHS's efforts "were more than reasonable" despite having stopped its provision of mentoring services, because there was "little evidence that mentoring sessions were effective and no evidence" that the mother would have benefited from certain other services); *Frazier*, 152 Or App at 583, 588 (DHS's efforts were reasonable even though it had declined to provide the father with therapy, because he had not requested that service and had failed to take advantage of other services).

Conversely, except in specific circumstances not applicable here,[4] DHS must at least "attempt[] to engage and work with" parents, even those who are incarcerated. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 508, 130 P3d 801 (2006). In doing so, DHS must give the parents a reasonable opportunity "to demonstrate their ability to adjust their conduct and become minimally adequate parents * * *." *State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 717-18, 145 P3d 354 (2006). And, in general, that is true even when the agency will bear the expense of providing the necessary services. *See State ex rel SOSCF v. Burke*, 164 Or App 178, 191, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000) (DHS's efforts were unreasonable where it declined to pay for ongoing sex offender treatment that was "a requirement for family reunification" and the cost of which "present[ed] an insurmountable barrier to the integration of children into father's home").

DHS's obligation to make reasonable efforts toward reunification does not, of course, mean that the agency must provide *every* service that conceivably could benefit a

---

[4] Under ORS 419B.340(5), the juvenile court may find that DHS is not required to make reasonable efforts toward reunification if certain aggravated circumstances exist, if the parent has been convicted of certain crimes, or if the parent's rights to another child have been terminated involuntarily. No party contends that ORS 419B.340(5) applies in this case.

parent, regardless of expense or other burdens. *Dept. of Human Services v. A. D.*, 255 Or App 567, 577, 300 P3d 185 (2013). The ultimate question remains, instead, whether DHS's efforts have been reasonable under the circumstances. *Id.* But in answering that question, a court must consider the *totality* of the circumstances, including both the costs associated with providing services and whether the parent is likely to benefit from services in a way that would increase the chances of family reunification. Put bluntly, when a parent contends that DHS's efforts have not been reasonable because the agency has declined to provide a particular service, the court's "reasonable efforts" determination should include something resembling a cost-benefit analysis, at least when—as here—the agency itself has deemed that service to be "key" to the reunification plan.

The record in this case does not reflect that sort of analysis. Rather, in concluding that DHS's efforts were reasonable, the juvenile court appears to have considered only the cost of performing the psychosexual evaluation while father is incarcerated, and not the potential benefits of providing that evaluation promptly, instead of waiting until he is released. Although the record in this case is not extensive, it includes assertions by father's attorney that evaluating father at the correctional facility, rather than after his release, could meaningfully advance his progress towards reunification with R. The results of such an in-prison evaluation might lead to father getting sex-offender treatment or could, instead, allow him to begin visitation with R immediately. But it appears that neither of those things can happen until father receives the evaluation. Consequently, delaying the evaluation until father is released from prison may significantly postpone—and therefore lessen the chances of—family reunification.

Given the importance of the psychosexual evaluation to the reunification plan, the juvenile court should have considered the extent to which the family might benefit if father received a psychosexual evaluation promptly, instead of waiting a year to be evaluated after his release. In other words, the court should have considered the totality of the circumstances related to the reasonableness of DHS's

reunification efforts, including both the potential benefits of providing services and the burden of associated costs. The record does not reflect such an analysis. Moreover, the parties did not proffer any evidence regarding the potential benefits (or lack thereof) of promptly providing father with a psychosexual evaluation that would support a determination, properly based on the totality of the circumstances, that DHS had made "reasonable efforts" to make it possible for R to return home. Accordingly, we reverse.

In his second assignment of error, father contends that the juvenile court erred in determining that he had not made sufficient progress toward reunification. Because our resolution of father's first assignment of error is dispositive, we do not reach his second assignment of error.

Reversed.