No. 463          July 3, 2024          587

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of Z. E.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. B.,
fka M. M. E.,
*Appellant.*

Multnomah County Circuit Court
17JU07682
Petition Number
D2022015
A182269

Morgan Wren Long, Judge.

Argued and submitted May 8, 2024; on respondent's motion to dismiss fifth assignment of error as moot filed June 7, 2024; appellant's response to the respondent's motion to dismiss fifth assignment of error as moot filed June 20, 2024; and respondent's reply to appellant's response to motion to dismiss fifth assignment of error as moot filed June 28, 2024.

M. M. B. argued the cause and filed the briefs *pro se*.

Stacy M. Chaffin, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

MOONEY, J.

DHS's Motion to Dismiss Fifth Assignment of Error as Moot denied. Permanency judgment reversed and remanded; order denying motion to dismiss reversed and remanded; otherwise affirmed.

**MOONEY, J.**

This juvenile dependency case is factually and procedurally complex. It began seven years ago as a voluntary case when mother placed her daughter, Z, with mother's sister. Z was six years old at that time, and the placement with her maternal aunt was due to mother's alcohol abuse and resulting neglect of Z. Within the first year of removal, mother engaged in two outrageous behavioral events that were singularly disruptive and that traumatized Z. Z is now a teenager, and she has refused to have contact with her mother for over four years. The case nevertheless remains open, and the permanency plan continues to be reunification. Mother appeals the following judgments and orders of the juvenile court:

1. Judgment of jurisdiction and disposition signed July 27, 2023.

2. Order denying mother's motion to dismiss jurisdiction signed July 27, 2023.

3. Order denying mother's motion to modify or set aside judgment signed August 24, 2023.

4. Permanency judgment signed September 18, 2023.

5. Order limiting discovery signed October 12, 2023.

Mother raises 10 assignments of error. We reject assignments three, six, seven, eight, and nine as unpreserved or undeveloped. Although preserved, we reject assignment 10 on the merits, without discussion.

In mother's first and second assignments, she challenges the juvenile court's conclusions that the Department of Human Services (DHS) made reasonable efforts to reunify the family and that mother made insufficient progress to make it possible for Z to safely return home. In her fourth assignment, mother challenges the court's exercise of jurisdiction on a new allegation under ORS 419B.100(1)(c), and in her fifth assignment, she argues that the trial court erred by denying her motion to dismiss without affording her a hearing on that motion. After this matter was argued, DHS filed a Motion to Dismiss Fifth Assignment of Error as Moot, and mother filed a response objecting to that motion.

As we will explain, the juvenile court did not err when it concluded that it had jurisdiction over Z based upon the new allegation of estrangement in DHS's second petition. Mother's fifth assignment of error is not moot, and we deny DHS's motion to dismiss that assignment. Mother was entitled to a hearing on her motion to dismiss jurisdiction with respect to the original jurisdictional bases, and we reverse and remand for the juvenile court to hold the required hearing. With respect to the permanency judgment, we reverse as to the agency reasonable efforts finding and remand for further proceedings.

## I.   STANDARD OF REVIEW

We review original and continuing jurisdictional determinations for legal error. *Dept. of Human Services v. J. C. H.*, 299 Or App 212, 213, 450 P3d 577 (2019) (reviewing for legal error the juvenile court's determination that dependency jurisdiction exists); *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 634, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014) (noting that the standards governing review of a juvenile court's continuing and original jurisdictional determinations are the same). As we conduct that review, we "view the evidence in the light most favorable to the court's disposition to determine if it supports the court's legal conclusions." *Dept. of Human Services v. T. F.*, 331 Or App 682, 684, 548 P3d 510 (2024) (internal quotation marks omitted). We draw the relevant facts and procedural history from the record, and we do so in accordance with that standard of review.[1]

## II.   THE FACTS

This case was opened in 2016 when the family came to the attention of DHS through reports that mother was abusing alcohol and neglecting Z. After a second allegation in 2017, mother voluntarily placed Z with her sister (Z's maternal aunt). That summer, Z's aunt arranged to take Z to Utah to visit her maternal grandmother. Mother did not approve of that trip. She contacted law enforcement authorities and accused her sister of kidnapping Z, which set into

---

[1] We decline mother's request for *de novo* review because it is not warranted. ORS 19.415(3); ORAP 5.40(8)(c).

motion a series of events including a criminal investigation and the issuance of an AMBER Alert, all of which were traumatizing for Z.

DHS filed a dependency petition and jurisdiction was established in 2018 when mother admitted the following allegations:

> "The mother's mental health issues, which include trauma and emotional distress, interfere with her ability to safely parent the child. The mother must continue engaging in mental health services to rectify her mental health issues.

> "The mother's alcohol abuse, currently in remission, interferes with her ability to safely parent the child. The mother needs to continue a prolonged period of sobriety in order to safely parent the child."

Additional allegations that mother's anger control issues and residential, employment, and financial instability interfered with her ability to safely parent Z were neither admitted nor proved, and the court dismissed them. Z was placed in the legal custody of DHS and continued in the placement with her maternal aunt.

The permanency plan was designated to be reunification. Among other things, DHS was ordered to develop a comprehensive case plan, establish a regular visitation schedule for mother and Z, and to make appropriate referrals for court-ordered services. Mother was ordered to complete a drug and alcohol evaluation, submit to random drug and alcohol testing (UAs), enroll in parenting classes, obtain stable housing, undergo a neuropsychological evaluation, maintain contact with DHS, and participate in Z's therapy as recommended by Z's therapist.

By the fall of 2018, mother was making progress toward reunification. She had successfully completed parenting classes and a substance abuse treatment program that required her to submit to urinalysis. Although anger control was not a basis of jurisdiction, DHS requested, and mother completed, an anger management course. A neuropsychologist, Dr. Poppleton, conducted a neuropsychological examination and a psychological evaluation of mother in

the summer of 2018. He diagnosed mother with alcohol use disorder in sustained remission, unspecified depression and trauma, and generalized anxiety. Mother engaged with and consistently attended therapy. As part of the reunification plan, Z and mother were having regular overnight visits and DHS was working to transition Z back to mother's care.

Progress toward reunification halted after an incident during a scheduled pick-up the day after Thanksgiving in 2018. When mother arrived at her sister's house, a disagreement between the sisters arose and escalated, and mother became physically assaultive toward her sister. Mother made several 9-1-1 calls from outside her sister's home accusing her sister of kidnapping Z and her nephew of sexually abusing Z. Z was present for this altercation, and she was traumatized by it. Mother's sister obtained a restraining order against mother after that incident and the allegations against the nephew were found to be without merit. The restraining order did not prohibit contact between mother and Z.

After that incident, Z began refusing to have contact with her mother. By the following spring, Z also started refusing to meet with her therapist, and DHS referred her to a new therapist, Hansa Gutierrez, at Options Therapy. DHS facilitated two family decision meetings in January 2019 to discuss a path forward. DHS arranged for Poppleton to see mother again in September 2019, at which time he recommended reunification therapy, evaluation of mother by a physician to consider the possibility of psychopharmacologic treatment (medication), continued UAs, and a skill-based therapy course known as dialectical behavior therapy (DBT).

By October 2019, Z was willing to restart visitation with mother every other month. Visits resumed and overall went smoothly. After three successful visits, the DHS caseworker arranged an increase in visits, but Z did not agree and has refused contact with her mother since March 2020.

Mother relapsed and was arrested for DUII in December 2020. After that, she completed additional drug and alcohol treatment and a full course of DBT.

In February 2021, Z underwent a mental health evaluation at the Kinship House, resulting in recommendations

that she not be forced to have contact with her mother because that would likely cause Z to regress emotionally, behaviorally, and academically. According to the Kinship House evaluation, Z's need for permanency with her aunt should be honored.

DHS asked the court to change the permanency plan from reunification to adoption, and in June 2021, a juvenile court referee granted that request. On rehearing, the juvenile court judge reversed the referee's order, continued the plan of reunification, and ordered the parties to engage in family reunification therapy. Seven months later, when Z was 12 years old, DHS arranged for a reunification therapist, Gina Silva at Reunification Works, to work with mother and Z. Mother agreed not to attend the initial sessions to allow Z an opportunity to get acquainted with the therapist and the process. Z's individual therapist, Gutierrez, attended the first sessions with Z and, despite a productive first session, Z became emotionally dysregulated during the second session. Gutierrez attributed Z's dysregulation to Silva's therapeutic technique. Gutierrez offered the following testimony specific to that reunification therapy:

"Q [COUNSEL FOR DHS]: Okay. Now, from your understanding of what therapy is, was this—was this work that was being done, did that meet the definitions of therapy?

"A [GUTIERREZ]: No. After—after—I mean, that was my first time experiencing something called, Reunification therapy. So no, I would not say that was therapeutic.

"Q: And why not?

"A: How it appeared to me, and because of [Z]'s reaction, it appeared to be interrogation. And [Z] expressed that much to me afterwards.

"Q: So [Z] reacted in the session itself. Did she also react in the months following those sessions?

"A: She appeared in subsequent therapy sessions with me to be more closed off to talking about her emotions.

"Q: And did you talk to her about that?

"A: Yes, lightly.

"Q:  In which—

"A:  The—the job of the therapist is not to make a client talk about things that are very uncomfortable for them. So I just—I've been taking it just at her pace.

"Q:  Okay. So following those two sessions, was there an exacerbation of [Z]'s mental health issues?

"A:  Yes, increased Anxiety."

DHS requested that Silva be removed from the case, at which point, Reunification Works withdrew from the case altogether, indicating that its therapeutic model "conflict[s] with ODHS practice on several fronts." For the next year or so, Gutierrez continued to attribute an increase in Z's anxiety to the Silva therapy session.

On July 21, 2022, mother filed a motion to dismiss jurisdiction and terminate wardship. DHS did not file a written response in opposition to that motion, but on August 16, 2022, it filed a "Second Petition" that sought to add the following jurisdictional allegation:

"As a result of the mother's chronic mental health issues and substance abuse disorder, among other things, the child experienced neglect and trauma while in the mother's care, including additional trauma caused by her mother while in foster care, resulting in an irreparable break-down in the parent child relationship. Return of the child to the mother would result in serious emotional harm to the child."

The parties agreed to proceed with a trial on DHS's second petition before taking up mother's motion to dismiss. Mother was still represented by legal counsel at that point. With respect to the break-down in the mother-child relationship, Gutierrez testified as follows during the jurisdictional trial:

"Q [COUNSEL FOR DHS]:  And from your work with [Z], are you able to attribute or identify what may be the cause for that estrangement?

"* * * * *

"A [GUTIERREZ]:  * * * [Z] has expressed to me that she is adamant about not wanting contact with her mother. And she's told me about specific experiences as an explanation of why she doesn't want that contact.

"Q:    And what experiences did she specifically point to?

"A: Let's see. And that has come out more recently. For a long time, she refused to give details about things. She has talked about her mother passing out or zoning out.

"* * * * *

"She recently shared memories of her mother passing out, or—or what she called, zoning out, and not being able to rouse her. She expressed memories of not having enough food in the house, or the dog not being cared for, and feces being on the carpet. She expressed fear in remembering those things. And she expressed she doesn't think that her mother is any different now."

Gutierrez further testified that she had no "indication" that mother's sister contributed to the estrangement between mother and Z.

Dr. Karina Peters, a psychologist with the Children's Program, testified that she evaluated Z, that Z's attachment to her mother had been "disrupted," that Z did not feel safe with her mother, and that Z was not willing to have contact with her mother. She also testified that it would be "extremely difficult, complex, and take a lot of time for [Z] to repair the relationship with her mother and to feel safe," and that "[i]f external forces other than [Z] pushed th[at] process," it would cause more damage to Z. Peters is not trained in "EMDR[,] *** a psychotherapy that enables people to heal from the symptoms of emotional stress that result from disturbing life experiences" and is "designed to alleviate distress associated with traumatic memories," however, she thinks that Z would benefit from such therapy.

By all accounts, mother has engaged in and completed all court-ordered treatment and services offered by DHS. Mother's therapists have reported to DHS that she is completing treatment goals and has made progress towards acknowledging her role in Z's trauma. With the help of a therapist, and at the request of DHS, mother prepared a clarification letter for Z which was provided to Z's therapist. Z has declined to read the letter, although she apparently indicated that she might be willing to do so when she turns 18. DHS caseworkers testified that although mother completed

all court-ordered services, they are concerned about whether mother benefitted from those services because she continues to minimize the severity of her own behavior and because she tends to cast blame on others.

Mother testified and acknowledged that her alcohol-fueled emotional outbursts traumatized Z and she admitted that she was the initial source of Z's trauma and that she continues to be a significant source of that trauma. Specifically, she testified:

"Q [COUNSEL FOR CHILD]: Okay. What is the source of [Z]'s trauma?

"A [MOTHER]:    I think it's multifaceted.

"Q:   Okay.

"A:   I think it's multifaceted.

"Q:   Okay. I heard you. What are all those facets?

"A:   Well I think exposure to my drinking was a trauma. I think that was, perhaps, the initial trauma. I think there were emotional outbursts that she witnessed that were traumatizing. I think the November 2018 * * * incident, regardless of whose version of it you would believe, was traumatizing.

"But—and all of those involved me, right? So I think that I am one of the multiple—and a significant one—of the multiple sources of trauma. But I think this case, I mean I've read some of the case notes, [Z] has made it clear that she just wants this case to end. She's having panic attacks about it and sobbing in her resource parents' homes. And you guys are bringing a new case. I think that's traumatic.

"Q:   Do you think it would be traumatic for [Z] to be removed from [her aunt's] home?

"A:   I think it would be as traumatic for her to be removed from her home, when she has now the fear that she has of me, as it was for her to be removed from my home when she had the fear she had at that time of the foster resource. So, yes, I think it was traumatic then, and I think it would be traumatic now."

Following the eighteen-day trial that commenced in November 2022 and concluded in May 2023, the court concluded that it had jurisdiction over Z based upon the

following modified jurisdictional allegation contained in the Second Petition:

> "As a result of the mother's chronic mental health issues and substance abuse disorder, among other things, the child experienced neglect and trauma while in the mother's care. As a result of the mother's chronic mental health issues, the child has continued to experience additional trauma caused by mother while in foster care. This has resulted in an extreme, potentially irreparable, breakdown in the parent child relationship. Return of the child to the mother, or forced contact between the child and the mother against the child's wishes, would result in serious emotional harm and damage to the child."

The juvenile court made credibility findings in its jurisdictional judgment to which we generally defer because the trial judge is in a better position than we are to observe and experience the witness's nonverbal cues, including non-language characteristics of speech such as tone and pace as well as accompanying body language. *See Dept. of Human Services v. T. L. B.*, 294 Or App 514, 516, 432 P3d 343 (2018), *rev den*, 365 Or 556 (2019) ("[W]e give considerable weight to the findings of the trial judge who had the opportunity to observe the witnesses and their demeanor in evaluating the credibility of their testimony." (Internal quotation marks omitted)). The court found mother's testimony to lack credibility. Among other things, it concluded that:

> "In addition to Mother's ongoing pattern of explosive angry outbursts, Mother also has a clear pattern of threatening and manipulative behavior toward others. Convincing evidence was presented regarding numerous instances of Mother threatening litigation when she does not like someone's actions, threatening to accuse someone of rape or child sexual abuse, and actually accusing multiple people of rape and/or child sexual abuse. The most striking was when Mother called the police to report that her nephew, the teenage son of Resource Parent, was sexually abusing [Z] less than 24 hours after the Thanksgiving Incident. It is abundantly clear that this was an entirely baseless claim without a shred of evidence that was made entirely in retaliation for nephew attempting to protect Resource Parent and defuse the situation during the Thanksgiving Incident. This pattern of threatening and

manipulative behavior was observed by the Court during the pendency of the trial, as evidenced by Mother's excessive subpoenas, threats to call [Z]'s attorney, and various cease and desist letters sent to witnesses. Though this behavior is not as directly harmful to [Z] as Mother's angry and violent outbursts, there is a very real potential that this could be damaging to [Z] in the future if Mother continues this behavior towards teachers, service providers, and community partners involved in [Z]'s life. Moreover, it highlights that Mother has yet to fully address the behavioral issues that place [Z] at risk of harm."

The court ultimately added the new jurisdictional basis, continuing wardship and the plan of reunification.

The juvenile court issued an order denying mother's motion to dismiss the original bases for jurisdiction as moot the same day it issued its jurisdictional judgment. DHS did not file a response opposing the motion to dismiss and it offered no arguments in opposition to that motion. Indeed, there was no hearing on the motion. The jurisdictional trial focused on the additional allegation DHS sought to add by the Second Petition, but it did not specifically address continuing jurisdiction on the existing jurisdictional bases. The judgment and order were entered on the last day of July 2023.

The court conducted a permanency hearing on August 30, 2023. On September 18, 2023, the court signed its permanency judgment in which it concluded that DHS had made reasonable efforts to reunify mother and Z and that mother had made insufficient progress toward reunification; it continued the permanency plan of reunification. The juvenile court specifically ordered mother to participate in mental health treatment that focuses on "interpersonal effectiveness, healthy emotional regulation, externalization of blame, and empowerment to create strategies to avoid future victimization with a mental health provider who has the ability and willingness to confront Mother about her role in past events[.]" It ordered DHS to refer mother to a different "provider" who would "provide the therapy to Mother as outlined in the jurisdictional judgment" and it ordered DHS to provide a copy of that judgment to the new provider.

This appeal followed.

### III.   ANALYSIS

A.  *Overview of Relevant Legal Principles*

The juvenile court has exclusive original jurisdiction in any case involving a person under the age of 18 who, among other things, is beyond the control of their parents, whose own behavior endangers their welfare, whose condition or circumstances endangers their welfare, whose parents have abandoned them or subjected them to cruelty, or who is a runaway. ORS 419B.100(1). We commonly see these cases filed with allegations that the child's condition or circumstances, attributed to unsafe parenting issues, bring them within the jurisdiction of the court. That is the case here.

Once the juvenile court made Z a ward of the court, a whole host of statutory requirements came into play. *See* ORS 419B.090(2) - (4) (describing constitutional and statutory rights of children and parents). There is a "strong preference that children live in their own homes with their own families," although that "is not always possible." ORS 419B.090(5). "[T]he statutes governing dependency jurisdiction are intended to protect the interests of children and parents and to promote family reunification, in all but extreme cases[.]" *Dept. of Human Services v. T. L.*, 287 Or App 753, 761, 403 P3d 488 (2017). The Supreme Court explained the respective roles of the juvenile court and DHS in dependency cases as follows:

> "[I]t is the policy of the state 'to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time.' ORS 419B.090(5). When the juvenile court places a ward in the legal custody of DHS, the juvenile court has authority to 'specify the particular type of care, supervision or services to be provided by [DHS] to wards placed in [DHS's] custody and to the parents or guardians of the wards'; however, 'the actual planning and provision of such care, supervision or services is the responsibility of [DHS].' ORS 419B.337(2)."

*Dept. of Human Services v. F. J. M.*, 370 Or 434, 441-42, 520 P3d 854 (2022) (brackets in original). Disruptions in a child's

life are often an unavoidable part of the dependency process and those disruptions can be traumatizing. Fortunately, the juvenile code establishes timelines "to move children quickly toward a permanent situation." *Dept. of Human Services v. T. J. N.*, 371 Or 650, 668, 540 P3d 540 (2023).

Permanency proceedings are an essential part of the juvenile dependency process once jurisdiction is established:

> "The purpose of a permanency hearing is to determine, or update, the permanency plan for the child and to establish the timetable and conditions for accomplishing that plan. Permanency hearings provide court oversight of the permanency plan, DHS's efforts, and the parent's progress in making the child's safe return home possible."

*Dept. of Human Services v. Y. B.*, 372 Or 133, 145, 546 P3d 255 (2024) (citations omitted). Agency efforts are reviewed by focusing on DHS's conduct, measuring the reasonableness of those efforts "through the lens of the adjudicated bases for jurisdiction[,]" *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017) (internal quotation marks omitted), and basing the review "on the totality of the circumstances." *Dept. of Human Services v. M. K.*, 257 Or App 409, 411, 306 P3d 763 (2013). Parental progress toward safe family reunification is measured by what the parent has done to ameliorate the circumstances that led to juvenile court jurisdiction. ORS 419B.476(2)(a). Both determinations—agency efforts and parental progress—are legal conclusions that are "heavily fact-driven." *Y. B.*, 372 Or at 149. As mentioned above, we review those conclusions for legal error.

B.   *The Jurisdictional Judgment*

We begin with the 18-day jurisdictional trial on DHS's Second Petition and the resulting judgment of jurisdiction. Although DHS did not use the word "estrangement" in its proposed new jurisdictional basis, and the court did not use that word in its modified version, that new basis of jurisdiction has, and continues to be, characterized as one of estrangement. As presented, it characterizes mother's mental health and alcohol abuse "issues" as "chronic," and adds language that those chronic health issues continue

to traumatize Z, resulting in the breakdown of the parent-child relationship, and that "forced contact" between Z and her mother will result in further harm to Z.

Mother contends that the juvenile court erred (1) in finding that DHS had proved the new jurisdictional basis and (2) in permitting DHS to present evidence supporting the new jurisdictional basis on the basis of collateral estoppel or *res judicata*. We reject as unpreserved and undeveloped mother's arguments regarding collateral estoppel and *res judicata*. But even if she had preserved such arguments, they fail on the merits. While it is accurate that estrangement is alleged to be a consequence of the same mental health and alcohol abuse issues that formed the basis for jurisdiction years ago, the new allegation is that those issues are "chronic," and that that chronicity has resulted in additional trauma to Z and the potentially irreparable breakdown of the parent-child relationship. That is a new allegation addressing a new circumstance that endangers Z's welfare if it is not remediated.

Mother's reliance on *T. L.*, does not compel a different conclusion. In *T. L.*, we reversed the juvenile court's decision to change the permanency plan away from reunification on the basis of estrangement when "estrangement" had not been a basis of jurisdiction and was "not fairly implied by the jurisdictional petition or judgment." 287 Or App at 765. Here, DHS sought to add estrangement as an additional allegation of jurisdiction, no doubt to avoid the notice problem presented at a later phase of the case in *T. L.* When viewed in the light most favorable to the juvenile court's disposition, the evidence supports the new allegation.

C.  *The Order Denying Mother's Motion to Dismiss*

The juvenile court summarily denied mother's motion to dismiss without a hearing, even though the motion specifically requested a hearing and oral argument. It concluded that the establishment of the new jurisdictional basis also necessarily meant that Z remained at risk of serious loss or injury from the original bases of jurisdiction. We agree that the establishment of the new jurisdictional basis would prevent termination of the wardship, but it does not

necessarily follow that mother no longer had a right to a hearing on her motion to dismiss the original bases of jurisdiction. She was entitled to a hearing on her motion and the trial court erred in denying the motion without that hearing.

The proper remedy would be to "remand[] to the juvenile court for a hearing to be held on the * * * motion to dismiss" to allow "both parties the opportunity to present or dispute evidence, and the juvenile court could then determine whether DHS continued to sustain its burden on the jurisdictional * * * bases." *Dept. of Human Services v. N. F. M.*, 315 Or App 596, 598, 502 P3d 782 (2021). We are aware, however, and take judicial notice of the fact, that mother filed a new motion to dismiss jurisdiction that is now pending in the juvenile court and for which a hearing has been scheduled. OEC 201(b)(2); *see also Dept. of Human Services v. S. A. B. O.*, 291 Or App 88, 91, 417 P3d 555 (2018) (taking judicial notice that DHS petitioned for jurisdiction on various grounds in earlier related petitions not in the record of the case). DHS has since filed a motion to dismiss this assignment of error as moot relying, in part, on *Hamel v. Johnson*, 330 Or 180, 184, 998 P2d 661 (2000) (explaining that our decisions "must have some practical effect on the rights of the parties to the controversy" and that "a case becomes moot when an event occurs that renders it impossible for the court to grant effectual relief") (internal quotation marks and brackets omitted)). But although the hearing has been scheduled, at the time of this opinion's publication, it has not yet occurred. We therefore reverse and remand for the juvenile court to hold the required hearing, and we deny DHS's pending motion regarding mootness. Assuming that the hearing that is currently scheduled proceeds, mother is not entitled to further relief on this assignment.

D.   *The Permanency Judgment*

Mother does not challenge the juvenile court's decision to continue the permanency plan of reunification, and we agree that the court committed no error in doing so. Mother instead challenges the court's conclusions that DHS made reasonable efforts to reunify mother and Z, and that mother failed to make sufficient progress toward the safe return of Z to her care.

The salient facts, summarized above, do not provide sufficient support for the juvenile court's legal conclusion that DHS made reasonable efforts to reunify mother and Z. Jurisdiction was established through mother's admissions of the circumstances that made it unsafe for her to parent Z; namely, alcohol abuse and mental health issues. Mother engaged in disturbing behavior that traumatized Z in the early years of jurisdiction, followed by a period of sustained sobriety. Mother completed all court-ordered services, and even after the traumatizing incident in 2018, reunification efforts were progressing until, in March 2020, Z refused all further contact with mother. That refusal came after the caseworker told Z that DHS planned to increase visits with her mother.

DHS efforts shifted to requesting a change in the permanency plan which was ultimately denied by the juvenile court. It took seven months after that before the first session of reunification therapy ordered by the court was held. Mother agreed not to participate in that first session that included Z, the reunification therapist, and Gutierrez. Z became emotionally "dysregulated" because of the therapeutic style of the therapist, and DHS discontinued reunification therapy before mother ever had a chance to participate. In the meantime, mother completed the additional services she was asked to do, but there were no more efforts by DHS to facilitate reunification therapy. To be sure, the juvenile court found that despite mother's completion of services, she continued to demand more time with Z without recognizing Z's need for "space," and she had not "honestly" acknowledged her own role in Z's removal from her care. And while there is support in the record for those findings, the reasonable efforts inquiry must focus on the agency's conduct, not mother's. *S. M. H.*, 283 Or App at 306.

The parties have hit a confounding impasse that is reflected in Z's continuing refusal to have contact with her mother. DHS relies on that refusal to argue that its efforts to reunify mother and Z have been reasonable. It emphasizes that it is "following [Z's] treatment providers' recommendations regarding contact with mother." But we are aware of no legal authority suggesting that a therapist's recommendations

relieve DHS of its statutory obligation to make reasonable efforts to accomplish the court-ordered permanency plan. And even if such authority existed, the evidence is that contact between mother and Z had resumed in 2019 and was proceeding in a positive direction. Z's renewed refusal of contact came only after she learned that visits with her mother were set to increase in frequency and after she attended reunification therapy and experienced anxiety in response to the therapeutic style of the therapist. Given that sequence of events, and the fact that it was DHS that had arranged for those changes, the current impasse cannot be attributed solely to mother's conduct. And given that the permanency plan continued to be reunification, DHS was obligated to continue making reasonable efforts toward that plan. But it stopped doing so, and there has been no contact between mother and Z since March of 2020. The juvenile court erred in concluding that the agency's efforts were reasonable.

In light of our conclusion that DHS failed to make reasonable efforts, we need not reach mother's second assignment of error regarding the juvenile court's determination that she failed to make sufficient progress. *See Dept. of Human Services v. D. M. R.*, 301 Or App 436, 443, 455 P3d 599 (2019) ("Before the juvenile court may change a permanency plan from reunification to adoption, the court must determine that * * * (1) DHS made reasonable efforts for the child to safely return home, and (2) *despite those efforts*, parents have not made sufficient progress to allow the child to safely return home." (Emphasis added.)); *see also Dept. of Human Services v. H. K.*, 321 Or App 733, 746-47, 517 P3d 1044 (2022) (noting that DHS's efforts afford a parent "the requisite reasonable opportunity to address the jurisdictional bases"); *see also M. K.*, 257 Or App at 419 (declining to consider assignment of error challenging the juvenile court's sufficient progress determination because the conclusion that DHS's failure to make reasonable efforts "is dispositive").

## IV.   CONCLUSION

In sum, of the five orders and judgments mother has appealed, we conclude that she is entitled to relief on two of them. We reverse the order denying mother's motion to dismiss jurisdiction and remand for the juvenile court to hold

the required hearing. In addition, because we conclude that the juvenile court erred in its reasonable efforts determination, we also reverse the permanency judgment and remand for correction of that determination.

DHS's Motion to Dismiss Fifth Assignment of Error as Moot denied. Permanency judgment reversed and remanded; order denying motion to dismiss reversed and remanded; otherwise affirmed.